## VANDERSLICE and CLARKSON, Appellants, v. JULIAN HANKS, Respondent.

A grant of land made while the country was under the dominion of Mexico, must be tested by the rules of law which then prevailed.   The cession to the United States has worked no change in the legal rights of private persons.

The power of the Mexican Government to grant land, is derived from the Congressional decree of 1824, and the regulations of 1828.

When the regulations require that a grant shall not be held to be sufficiently valid without the previous consent of the Territorial Deputation (legislature), and provides that the definitive grant being made, a document signed by the governor shall be given to serve as a title to the grantee, and the governor delivers the title,—the presumption arises that the governor fulfilled his duty, and that the grant had the approval of the legislature, and if the contrary be asserted, it must be shown by proof.

Nor is this view weakened by the words in the deed, "subjecting himself (the grantee), to the approbation of the most excellent departmental assembly."

And is strengthened in view of the disordered state of the country, the irregularity of legislative proceedings, and the absence or loss of these records.

If it was the duty of the grantor to obtain the legislative approval, and the governor, who had the sole power, had exercised it, and made the grant, the necessity of obtaining their approval was a condition subsequent to the grant.

A grant made on a condition subsequent, where no time is limited for its performance, and the condition becomes impossible, the grant becomes single and absolute in the grantee.

When the land granted is described by specific boundaries, and the deed is accompanied by a diagram or plot, which it expressly mentions as descriptive, although more land is contained within the description than the quantity called for by the grant, and a judicial survey is required to be made by the grantee, the failure to procure such survey works no forfeiture; it can be made at any time.

When such grant contains a surplus, the title is good for the whole lot, defeasible for the surplus.

If the grantee neglect the directions imposed by the grant, his land may be *denounced* and granted to another; or it may be forfeited to the government; but in the absence of denouncement or forfeiture, his right to the whole is good against the world.

To sustain a grant from a town, it is necessary to show that the lands granted were the property of the town.

Hearsay evidence, even with regard to boundaries of parishes or towns, is only received where such boundary is of remote antiquity; and query, if ever it should be received to affect a private right.

APPEAL from the District Court of the Third Judicial District, for the county of Santa Clara.

This was an ejectment brought by the plaintiffs for the recovery of a tract of land in Santa Clara County. The plaintiffs claimed to be the legal owners in fee simple, and entitled to the possession thereof, which is thus described in the grant, as translated from the Spanish: "Two locations for large cattle, within the lands named St. John Baptist, adjoining the rancho of Gentleman Luis Bernales, the ranch of Justo Larios the Sierra, with the spot or place of the Hernandez and the Pueblo of San Jose, without encroaching on the Alisal which belongs to the latter place," by virtue of a grant made in due form of law by the Citizen Manuel Micheltoreno, Governor, &c., to Augustin Narvaez, on the 13th March, 1844 (see this deed or grant set out

in full in the opinion of the court), which grant was accompanied by a map or plot of said land from the same source, and by virtue of a deed from said Narvaez to complainant, made the 25th April, 1850. That long after the deed to Narvaez, but before his deed to complainant, the defendant entered upon and took possession of said tract of land, and has ever since held, and continues to hold, unlawful possession of the same. That plaintiffs, after their purchase from Narvaez, took possession of part of said tract of land in the name of the whole, and pray judgment, &c.

The defendant's answer denies all the allegations of the complaint, and further says, that he is possessed of said land as owner thereof, by virtue of a grant, lease, or loan, from John Burton, the Alcalde of San Jose, from the 30th day of August, 1847, which grant, &c., is hereto annexed as part of this answer, and that he has fulfilled all the conditions of the grant, &c., and prays to be dismissed.

The grant under which plaintiffs claim, as will be seen, was for two leagues, more or less, to be surveyed according to the map or "*dicino*" which accompanied the grant. The tract embraced in the boundaries described contains considerably more than two leagues. Narvaez took possession under the grant, and has ever since continued on the tract. His deed to plaintiffs in 1850 was for the whole tract, except two leagues, which he reserved to himself, and for which two leagues the plaintiffs executed a release or quit-claim to him.

On the trial, the plaintiffs gave in evidence the grant from Micheltoreno to Narvaez, and map. The conditions of the grant, as will be seen, are, 1st. That it shall be approved by the departmental assembly. 2d. That the grantee shall solicit to be put in possession by the proper officer. 3d. That the tract granted shall contain two leagues, a little more or less, according to the map, and that the magistrate who shall give him the possession, shall cause the land to be measured according to ordinances, and that the overplus " shall remain to the nation," &c.

The plaintiffs gave in evidence, also, the deed from Narvaez to them, in which the land is described substantially as in the grant; the two leagues are described by metes and bounds, and are

reserved, as stated above. The plaintiffs then proved the boundaries, as described in the grant and map, and that defendant was in possession of 500 acres within the tract, but outside of the two leagues reserved to Narvaez; and also proved the possession of Narvaez for twenty years, and that his claim was understood in the neighborhood to extend to the boundaries described in the grant and the map.

The defendant offered in evidence a deed from John Burton, Alcalde of San Jose, of April 30th, 1847, for the 500 acres in controversy. From the view taken of the case by the court, it is unnecessary to note further the peculiarities of this instrument, or the exceptions taken to it.

The defendant also gave in evidence a deed from the Mayor of San Jose, which comes within the above remark, and there was hearsay proof that the land in dispute was included within the ancient boundaries of the Pueblo of San Jose.

The plaintiffs moved the court to instruct the jury :—

1st. That the original grant and "dicino" formed but one title, and are to be considered together.

(This was given with the qualification, "that the grant does not necessarily embrace all within the ' dicino.'")

2d. That if the jury find from the evidence that defendant is upon the land enclosed within the " dicino," they should find for the plaintiffs. (Refused.)

3d. That the possession of Narvaez, plaintiffs' grantor, is the possession of plaintiffs, and that plaintiffs have the same right to maintain this action that Narvaez originally had. (Given.)

In charging the jury, the Judge said :—

" That the rule of the civil law which governed in this case was, that in the construction of the description of land, as contained in a deed or grant, when natural boundaries are set forth, and the quantity of land is stated, in case of a variance of quantity on actual survey, by the boundaries expressed, the quantity of land is governed by the actual boundaries; but when *artificial* boundaries are set forth, and the quantity of land granted is stated, in case of a variance on actual survey, the quantity expressed in the grant should govern; that in the case at bar, the land being described by boundaries partly *natural* and partly

*artificial,* and the quantity being expressed, and a variance found, that the rule of *artificial* boundaries governed, and the grantee should be limited by the quantity expressed in the grant, which should be surveyed off to him within the limits described."

The plaintiffs excepted to the qualification of the first instruction, the refusal of the second, and to the charge, and a verdict and judgment having been rendered for the defendant, the plaintiffs appealed.

*Crockett* and *Wells* for appellant.

The grant from Micheltoreno to Narvaez was valid, and vested the title in the grantee. It was not incumbent on plaintiffs to show that Narvaez had complied with the conditions; the grant was absolute, and conveyed the title, subject to be defeated by a failure to fulfil the conditions, " he shall lose his right to the lands, and it shall be denounceable by another." The conditions were to be performed subsequently to the grant, and in such cases none but the grantor can avail himself of a failure. Walker, 119; 7 Pick. 111; 9 Mass. 501; 7 Con. 201; 3 Mo. 40 ; 1 Overton, 370 ; 18 Conn. 535 ; 11 Paige, 414, and 8 N. H. 477.

It was not necessary to show that the grant was approved by the departmental assembly. There was no time limited within which the approval should be obtained, before the cession of the country to the United States. Since the cession the condition has become impossible, because there is no such body ; and this is true of the condition requiring application to the magistrate for the judicial possession. Raw's Rep. 652; Sto. on Cont., sec. 32; 2 Sto. Eq. 1304–6; 6 Pet. Rep. 691; 6 Greenl. 430; 2 Wend. 517.

The grant, and the map or " dicino," which accompanied it, are to be construed together. The fourth condition of the grant expressly refers to the diagram for the description of the land granted, and its boundaries. The endorsement on the diagram shows that it accompanied the grant as one of the muniments of ˙title, and the proof is, that the latter was predicated upon it : there was therefore error in the qualification added by the court to the instruction. 4 Mass. 149 ; 6 Ser. and Raw. 488 ; 17 Mass. 207–11 ; 1 Greenl. 219 ; 20 Pick. 62.

The boundaries called for are all *natural*, and not partly natural and partly artificial, as stated in the charge, and the Judge therefore mistook the facts, and thus the jury were misled. When the boundaries are marked and defined, the whole quantity embraced within them will pass.  Course, distance, and quantity must yield to the actual, visible boundaries, as called for in the grant.  2 Mass. 380; 6 Mass. 131; 11 Mass. 193; 5 Mass. 494; 1 Har. & J. 167; 1 Con. 605; 2 N. H. 303; 3 Fairf. 320; 2 Roy, 575; 3 Pick. 401; 5 Pick. 135; 13 Pick. 145; 5 Har. & J. 163; 3 Hain. 282; 5 Ib. 534; 5 Con. 371; 9 Ib. 661; 13 Wend. 300; U. S. Dig. 474, secs. 15–39.

The overplus could only be ascertained by the measurement of the magistrate.  This measurement never was made, and until made, the grantee had title to the whole; and this condition has become impossible by the change of government.  The defeasance is therefore void.  The title passed *in presenti*, and the whole vested or none.  "I have determined to concede to him the land mentioned, *declaring to him the ownership thereof by the present letter.*"  The overplus has not been, and now cannot be, ascertained in the form prescribed by the grant, and the grantee's title is therefore good for the whole.

The subsequent clause reserving the overplus to the nation, was void if not construed as a defeasance, and cannot be regarded as a reservation repugnant to the grant.  If a defeasance, the condition to give it effect has become impossible, as above explained.  3 Pick. 272.

The possession of Narvaez more than 21 years, was possession of the whole, and he had claimed the whole from 1844.  Possession will maintain ejectment against a trespasser or any one not showing a better title.

But plaintiff has shown a *prima facie* title in addition to his possession, and defendant being a mere trespasser, cannot question it.  Courts in such a case will not look very closely into the plaintiff's title.  9 Mo. 477.

Defendant's title as set up is absolutely void.  There is no legal proof that the land in controversy ever belonged to the town or Pueblo of San Jose, or that there ever was a grant for the same from the Mexican or Spanish government except to Narvaez.

When the terms of a grant are vague, or the boundaries doubtful, they are to be taken most strongly against the grantor. 8 Com. Rep. 369–5; Har. & Johns. 163.

*Jones,* for respondent. The title of plaintiff under Narvaez is defective, because the grant was within the limits of the Pueblo de San Jose de Guadelupe. There was no direct grant to the Pueblo of common lands proven, but they were acquired by the operation of law as the result of her legal establishment as such, and by preemptive right.

The Pueblo was founded in 1777, under directions to the Governor Neva by the viceroy of Mexico. On the 1st of June, 1779, Governor Neva drew up regulations for the government thereof, which were approved by royal order, Oct. 24, 1781. *Vide* Halleck's Translation and W. C. Jones's Rep.

The Pueblo was acknowledged by various acts of the Spanish government, and by the departmental government of California, and the known and fixed boundaries of her common land recognized. *Vide* Annellaga's Recopelation, p. 163, Title XIV., of May 8, 1838.

The quantity of land granted to a Pueblo, on its establishment, was four leagues square, or sixteen superficial leagues. *Vide* Recopelation de Indas, Vol. 2, Book 4, Title 5, Con. 6, and Title XIV., also W. C. Jones's Rep. p. 31 and 32.

Common and pasture lands were granted by the royal decree of 1781. *Vide* Halleck's Translation.

The grant of the Pueblo must be presumed, from long usage and the exercise of right *within* the boundaries, proven to have existed for three-fourths of a century with known and fixed monuments. *Vide* Esencho, p. 532, 34, 35.

The Pueblo has a grant by preemption and by operation of law. *Vide* Esench. p. 551, 2. The common lands were inalienable, even by the Crown itself; consequently, no grant was valid. *Vide* Noviscino, Recop., Vol. 3, p. 382, Titulo XVI., Book VI., Con. 1, and White's Recopn., Vol. 2, p. 100, 111, 113. They were given for common usage and as a source of revenue, and could only be leased, the lessee paying a rent-charge for a definite period.

They were called hereditaments in the law of Spain; and the Pueblo held said lands in perpetual succession. All grants were therefore absolutely void. The boundaries of the Pueblo de San Jose were known and fixed in 1800, and confirmed in 1836, and the monuments renewed under the government authority. Ancient monuments not only fix the extent of the boundary, by the law of Spain, but are evidence of *title* to their extent. *Vide* Esencho, p. 435.

The evidence shows that the grant to Narvaez was within the ancient limits of the Pueblo bounds, and no consent of the Pueblo prior to such grant, and no rent-charge paid in the terms of the grant. So a tax must be paid to the Pueblo for land granted on their common, and all grants are of this character, save the grant to Narvaez. Even the grants under tax or rent-charge were not good, save by the consent of the Pueblo; and this the plaintiff has not shown.

The title to the land claimed by the plaintiff is in the United States or in the Pueblo; for the authorities of California had no right to grant Pueblo common lands in absolute title.

The title of Narvaez never was confirmed by the Departmental Assembly, and is inchoate and imperfect, wanting the sanction of a co-ordinate branch of government to make it good. *Vide* Annellaga's Recopelation, and Decrees of the Mexican Congress.

Juridical possession never was given; there was therefore no severance of the Pueblo domain. There was no survey as required. See Ashly et al. *v.* Crane, 7 Wen. Rep. 99, and 4 Rep. 517.

The common lands of the Pueblos have been invariably confirmed by the general government of the United States, as in the action of the commissioners to settle land titles, and Congress, in Louisiana, Florida, and Missouri; the Pueblos of St. Louis, St. Charles, and St. Genevieve. *Vide* Acts of Congress, Reports of Commissioners, and Mo. Reps.

If the lands in question are not Pueblo common lands, they are part of the public domain of the United States, and the defendant in possession should not be disturbed. *Vide Small v.* Hepburn, Reports of Supreme Court. (1 Cal. Rep.)

The grant to Narvaez was intended to grant but two leagues, which it specified was to be surveyed by the proper officer, the

overplus to remain a part of the public domain. All the clauses in a contract must be considered in its construction; that clause therefore which gives to the grantor "two leagues, a little more or less," must be taken in connection with that clause which specifies that he must have the two leagues surveyed by the proper officer, and the clause that the surplus shall remain to the government.

Public grants must be construed strictly, and not extended beyond their natural import by implication. 8 Peters, 738; 3 Peters, 289; 4 Peters, 168; Ib. 514; and therefore the grant to Narvaez cannot be taken to include *three leagues and one-tenth,* the quantity now claimed, when the object was to convey but two.

Natural boundaries must govern, when called for, over artificial lines. The map does not govern in the measurement of the land.

By the terms of the grant, there is an open boundary on the northeast; as it is specified to be bounded by the Pueblo lands, the two leagues should have been surveyed within the known and marked boundaries towards the southwest, and the Sierra Azul, leaving the line still open on the northeast. For the general law on the subject of boundaries, see 4 Wheat. 444; 3 Pet. 96; 6 Pet. 498; Payne's, C. C. R. 494; 4 Kent, 466, and note, 467.

The counsel also contended that the title of defendant was good; but the view taken by the court, renders any report of this part of the argument unnecessary.

HEYDENFELDT, Justice, delivered the opinion of the court, with whom ANDERSON, Justice, concurred.

This was an action of ejectment for lands in Santa Clara County. The plaintiffs derive title from Augustin Narvaez, who derives from a grant of the Mexican Governor Micheltoreno, which is in the following words :—

" [L. S.] Seal. Provided temporarily by the Maritime Custom House of the port of Monterey in the Department of the Californias for the years 1844 and 1845.

[Signed.]                                   MICHELTORENO.

PABLO DE LA GUERRA.

"The citizen Manuel Micheltoreno, Brigadier-General of the Mexican Army, Adjutant-General of the Staff of the same, Governor, Commandante of the Staff and Inspector of the Department of the Californias :—

" Whereas the citizen Augustin Narvaez has solicited for his personal benefit, and that of his family, two leagues within the land named San Juan Baptista, bounded by the farms of the Messrs. Bernales and Justo Larios with the mountains, with the place of the Hernandes and the town of San Jose, without passing the grove of sycamore trees, which belong to it (the Pueblo), after having previously made the examinations and taken the steps according to the laws and regulations in the exercise of the facilities with which I am invested in the name of the Mexican Nation, I have determined to concede to him the land mentioned, declaring to him the ownership thereof by the present letter, subjecting himself to the approbation of the most excellent Departmental Assembly, and under the following conditions :—

" 1. He shall not alienate, or hypothecate it, impose any tax upon it, entail it, nor give it in security, nor place incumbrance upon it.

" 2. He may fence it without prejudice to the public roads and public uses, he shall enjoy it freely and exclusively, destining it to the use or cultivation which may be most convenient to him; but within one year he shall build a house, which shall be inhabited.

" 3. He shall solicit from the respective judge to give him the juridical possession in virtue of this despatch, by which the lines shall be marked out, on whose limit he shall place, besides the landmarks, some fruit or forest trees of some utility.

" 4. The land of which donation is made is of two leagues, a little more or less, according as is explained by the respective diagram; the judge who should give the possession shall cause it to be measured according to ordinances; the overplus that shall result from that measurement remaining to the nation for its convenient uses.

" 5. If he should contravene the conditions, he shall lose his right to the land, and it shall be denounceable by another. In consequence, I command that these presents shall serve him as

a title, holding it as firm and valid, and an account to be taken of it in the corresponding book, that it be delivered to the party interested for his security and other uses.

" Given in Monterey, March 30, 1844.

"MICHELTORENO.

"MANUEL JIMENO, Secretary.

" Registered in the respective book, folio 8.

"JIMENO."

To this grant is attached a diagram or plat, with the following certificate :

" I, the undersigned, Secretary of the Despatch, certify that the diagram which is manifested in the foregoing page is a counterpart of the original, which exists in the office of Secretary of Government, under my charge.

"MANUEL JIMENO, Secretary."

" Monterey, 30th March, 1841."

It was objected to the sufficiency of this grant :—

1. That there was no evidence of its approval by the Departmental Assembly of California.

2. That juridical possession was not given by the proper officers.

3. That it was not surveyed according to the terms of the grant by the legally constituted officer.

4. That whilst the quantity granted is but two leagues, there is shown by actual survey to be within the boundaries granted more than three leagues, and that Narvaez has now possession of two leagues.

This grant was made while the country was under the dominion of Mexico, and must be tested by the rules of law which then prevailed, and which authorized its execution.   The cession of the country to the United States has worked no change in the legal rights of private persons.   By the law of nations they are equally protected without any treaty stipulations ; and this principle has been in many cases recognized by the Supreme Court of the United States.  In Mitchell et al. *v.* the United States, 9 Peters, the court says: " By the law of nations the inhabitants of a ceded

country retain all rights of property." And again: " A treaty of cession is a grant by one sovereign to another, which transferred nothing to which he had no right of property. By the treaty with Spain, the United States acquired no lands in Florida to which any person had obtained a perfect or an inchoate title." See also United States *v.* Percheman, 7 Peters; Strother *v.* Lucas, 12 Peters.

The power of the governors of Mexican territories to grant land is derived from the Congressional Decree of 1824, and the pursuant regulations of 1828. See Rockwell's Spanish and Mexican Law, 451.

The 4th of the regulations of 1828 is the one on which the first objection to the present grant rests. It declares : " That grants made to families or private persons shall not be held to be definitively valid without the previous consent of the territorial deputation, to which end the *expedientes* shall be forwarded to it."

By the *expedientes* is meant all the papers or documents constituting the grant or title.

The 8th regulation declares : " The definitive grant asked for being made, a document signed by the governor shall be given to serve as a title to the party interested," &c.

By a proper construction of these regulations, it appears that it was the duty of the governor to make the grant, and then to forward it to the territorial deputation for their sanction, and that being obtained, to deliver it to the grantee as his evidence of title. The identity of language used in the 5th and 8th regulations seems to establish this view beyond dispute. In the 5th are the words " shall not be held *definitively valid,*" while the 8th says " the definitive grant being made."

It, therefore, seems clearly to follow that, until the approval of the territorial deputation, the governor could not deliver to the petitioner the document which was to serve him as a title.

It is a familiar principle of law that every officer is presumed to have done his duty, and not to have exceeded the limit of his authority, and this principle has been recognized by the highest court of the United States in reference to the same subject now under review, the grant of lands by governors of foreign territory.

In the case of Arredondo *v.* The United States, they say that a grant made by a governor is *prima facie* evidence that his power was not exceeded.

If, then, as I have shown, the governor had no right to deliver the grantee his title until it became definitively valid by the sanction of the territorial deputation, and if, as appears here, the title was delivered, then the presumption arises that the governor fulfilled his duty, and, consequently, that the grant had the approbation of the legislature; and until the contrary is shown by proof, the rules of law imperatively establish this conclusion.

Nor can this view be in any degree weakened because in the deed is found the language " subjecting himself to the approbation of the most excellent Departmental Assembly."

The insertion of these words was proper to show that the grant was made in conformity to the regulations in that respect. It was also an evidence of deference to the will of the legislature, dictated doubtless by official courtesy, which had established it as a formality. It will certainly not be contended that after the action of the deputation the words should have been erased ; and a new grant could not be issued, because it was the grant itself (*expediente*) which had to be submitted for their approval.

I deem it proper, as connected with this view of the subject, to refer to notorious facts constituting a part of the history of the country. Before its conquest by the United States its condition was semi-civilized ; its population was sparse, and composed mostly of the inferior and illiterate races, and proper notions of parliamentary usages prevailed but to a small extent, if to any at all. It appears at one time that for a period of more than two years no journal was made of the proceedings of the territorial deputation ; at various other times there were similar omissions ; and for those periods in which the journals were made, the records of them which are preserved disclose the evidences of great loss and destruction. It would therefore seem that in probably a large majority of cases it would be impossible for grantees to prove the action of the legislature in relation to their respective grants.

This state of facts exemplifies the wisdom of the rule of law, which in this case presumes that the highest officer of the govern-

ment of this department did not exceed his authority or transcend the limits of his duty. But suppose, as is assumed on the side of the defendant, it was the duty of Narvaez to submit his grant, and obtain by his own action the approval of the Departmental Assembly; it would then result that as the power to grant was alone vested in the governor, and as he had exercised his power and made the grant, the necessity of obtaining legislative approval was a condition subsequent to the grant; and this I will treat, together with the other subsequent conditions, the non-performance of which is complained of, to wit: the want of judicial possession and the want of a survey.

Many cases have been decided by the Supreme Court of the United States involving the same question, arising in cases of grants made in Florida and Louisiana. There is, however, no case which I have seen where the grant has been rejected for the non-performance of the conditions, except when a time had been limited in the grant for the performance of the condition and it had never been performed. This was the case in United States *v.* Mills' heir, 12 Peters; United States *v.* Kingley, 12 Peters; United States *v.* Drummond, 13 Pet.; United States *v.* Burgevin, 13 Pet.; United States *v.* Wiggins, 14 Pet. While in the case of Arredondo, where no time was limited, it was confirmed, notwithstanding the non-performance. The court say, "We now consider the conditions upon which the grants were made" —"there can be no doubt that they are subsequent; the grant is in full property in fee, an interest vested on its execution which could only be divested by the breach or non-performance of the conditions." "No time was fixed for the completion of the establishment. It is an established rule of law that if a grant is made on a condition subsequent, and its performance becomes impossible by the act of the grantor, the grant becomes single."

The very same language, with but little alteration, might be applied to this case. No time was limited for the performance of the conditions, and the day before the country was ceded to the United States, the right of Narvaez to fulfil the conditions was undisturbed and complete.

It may be said that when no time for performance is fixed, the law will intend a reasonable time; but even if that be conceded,

here was a method pointed out by which it should be determined; in the language of the grant, " it shall be denounced by another."

Then it follows that even if a reasonable time had elapsed, the donouncement by another, or some other action of the government to enforce a forfeiture, would be the only actual limitation as to time.   There was no denouncement, and no complaint by the government.   On the contrary, stipulating solemnly for his protection and enjoyment of his property, she cedes the country to another government, and thus, by her own act, puts it for ever beyond his power to fulfil the conditions of his grant.

Blackstone, speaking of conditional grants, says :—" These express conditions, if they be impossible at the time of their creation, or afterwards become impossible by the act of God, or the act of the feoffor himself, or if they be contrary to law, or repugnant to the nature of the estate, are void.   In any of which cases if they be conditions subsequent, that is, to be performed after the estate is vested, the estate shall become absolute in the tenant."   2 Black. 157.

The same doctrine, I have already shown, was held in the Arredondo case. .

Testing the objections which are under consideration by these decisive authorities, they must unquestionably fall.

The next question to be considered relates to the fact that the boundaries of the grant contain more than three leagues, while the grant was only for two.   It is argued that until the juridical survey directed by the terms of the grant was performed, so as to set apart specifically the quantity granted, there was no segregation of it from the public domain, and various decisions of the Supreme Court of the United States are cited in support of this position.

I have carefully examined those cases, but I find none which conforms to this.

Here the land is described by specific boundaries, and the deed, accompanied by a diagram, or plat, which it expressly mentions as descriptive—and then uses the most distinct terms of conveyance or grant of " the land mentioned."

In the cases referred to there is in fact no description of the land, no boundaries, no point of commencement for a survey.

The case of Wherry *v.* United States, 10 Pet., was a grant for "1600 arpents of land near the Rivers Dardennes and Missippi, in the vacant lands of the king."

The case of John Smith, T. *v.* United States, was a grant of "10,000 arpents, with permission to locate in separate places," anywhere that was suitable to the grantee.

Buyck *v.* the United States, 15 Peters, was for "lands at Musqueto, south and north of said place."

O'Hara *v.* the United States, 15 Pet., was a grant for "land in the District of Nassau."

United States *v.* Delespine, 15 Pet., was a grant for "land at New River."

United States *v.* Miranda, 16 Pet., was a grant for "8 leagues square on the waters of Hillsborough and Tampa Bays."

Equally uncertain and indefinite are the grants in the cases of United States *v.* Boisdore, 11 Pet. 63 ; United States *v.* Lawton, 5 How. 10 ; Lecompte *v.* United States, 11 How.   In all of these cases, and in many others, no land is pointed out by the grant as subject to individual ownership, and there was in fact no separation of any portion from the public lands.   In some of them, also, as in Lebois *v.* Brommell, 4 How. ;  Blanc *v.* Lafayette, 11 How.; Lecompte *v.* United States, 11 How. ; and Menard's Heirs *v.* Massey, 8 How., there was no actual grant, or no terms of grant, and therefore they were held to have no standing in court, whilst in the Arredondo case, which was a case of actual grant, it was held that want of survey did not interfere with the title of the grantee : 13 Pet. 133.

In the case under consideration, the land was sufficiently defined by boundaries, so that in order to find the land there was no necessity for a survey, the description being clear enough without it.   The only apparent necessity for a survey was to ascertain if the granted lands contained more than the quantity intended to be conveyed, and if so, to return the surplus to the public domain.   That object might be accomplished at any future time, and it would be unreasonable to say that the delay had forfeited the grant, when the government is still not precluded from an official admeasurement which will secure her rights.

The same question arose in the case of Taylor & Quarle *v.*

Brown, 5 Cranch. Chief Justice MARSHALL says, "The fifth objection made by the defendant is, that the patent of the plaintiff contains surplus land; the warrant, it is said, was an authority to survey only two thousand acres, and for the surplus the survey was made without authority. It is a fact of universal notoriety in Virginia, not only that the old military surveys, but that the patents of that country generally, contain a greater quantity of land than the patents call for. The ancient law of Virginia notices this fact and provides for the case. It prescribes the manner in which the surplus may be acquired by other persons, and it is worthy of notice that the patentee must himself reject the surplus before it can be acquired by another.

"The survey is an appropriation of a certain quantity of lands by metes and bounds, plainly marked by an officer appointed by the government for that purpose, and it would seem that the government receives his plot and certificate as full evidence of the correctness of the survey. This being the case, it is admitted by the government to be an appropriation of the land it covers; and it is difficult to discern a rule by which the survey could be reduced on a caveat by the owner of an interfering survey, unless the entry of it was in such terms that the excess might be considered as surveyed contrary to location, for to every and to each part of the land surveyed its owner has an equal right.

"In conformity with this opinion is that of the Judges of Kentucky. Not a case exists, so far as the court is informed, in which on a caveat the quantity of land in the survey has been considered as affecting the title upon the single principle of surplus, yet the fact must have often occurred." See also the case of Johnson v. Buffington, 2 Wash. 116, and Holmes et al. v. Trout et al. 7 Peters, 171.

The remarks of Judge MARSHALL above quoted may very well be applied to this case; and there would be a strict analogy by using the word "grant" instead of "survey." It follows that until the proper proceeding is adopted to restore the surplus to the public domain, that "to every and to each part of the land granted, its owner has an equal right."

It is natural to suppose that the applicants for grants, like the mass of mankind, were but indifferent judges of the quantity of land contained within the limits of natural boundaries. In asking for a specific piece of land, they must have only guessed at the quantity.

The governor, in making the grant, must have been still more incapable of determining if the right quantity was represented in the petition; hence, although guarding against mistake or imposition by directing the survey and measurement, he acted upon the presumption that the representation as to quantity was correct, and made a positive grant of the entire tract contained within the specified boundaries, at the same time providing for the return or reservation to the government of the surplus, if any, when it should be ascertained in the mode pointed out.

It was therefore already a grant of title to the whole, with a defeasance as to the surplus.

If the grantee neglected any of the directions imposed by the terms of the grant, there is no doubt that his land might have been denounced and granted to another, or probably by some other proceeding forfeited to the government. But as long as there was no denouncement and no forfeiture, as long as the government did not complain of his inaction or neglect, or limit the performance of the conditions within any given time, so long did his right to the whole remain perfect and complete against the whole world. No third person had the right to come in and determine that his possession contained more than the quantity granted, because, as I have shown, the presumption was otherwise when the grant was made, and if the presumption was contrary to the fact, the fact itself was only to be ascertained in a judicial survey by the officer of the government. Until then it was never legally determined, and there was no surplus.

This view is strengthened by the consideration that no harm could accrue to the Mexican government by such a construction. Land in this department, at that time, was an object of but little care and less value. It was granted to her citizens and to foreigners freely and without stint. No one needed to have trespassed upon or denounced the possession of another, because his own demands could meet with abundant supply from the

extensive ungranted domain of the Republic, and even if the government had deemed it of importance that the public lands contained in the surplus of the various grants should be severed from the granted land, she might easily have enforced such partition by directing an immediate survey, or by forcing a forfeiture for the want of it.

On the other hand, if it was allowed (when the government did not complain) to any individual to enter upon the granted land and decide for himself that there was a surplus within the granted boundaries, to which the grantee was not entitled, it may readily be seen that by a combination of two or more of such trespassers, the grantee might be deprived of all his land; for if one was allowed to resist his right on the ground of surplus, so might each one of many, after entering, contend and insist that he alone held and claimed the surplus; and thus the party who is the real donee of the government, and upon whom she designed to bestow her favors, would be stripped of his possessions for the benefit of others for whom no such provision was intended.

I now come to the consideration of the defendant's title.   He claims by virtue of a grant from an Alcalde of San Jose.   The regularity of this grant is assailed on various grounds, but the view I have taken renders it unnecessary to consider them.   To sustain this grant, it was necessary in the first place that the lands in dispute had been the property of the town of San Jose. No title was exhibited establishing this fact, and the only evidence in relation to it was derived from reputation as to the boundaries of the town.   Hearsay evidence is for the most part allowed in matters of general or public interest.   It has been a matter of much dispute whether it should ever be received to affect a private right.   But even by those judges who have favored its admission, it was always considered as only auxiliary to other evidence which had laid the foundation of the right. Doe *v.* Thomas, 14 East; Morewood *v.* Wood, 4 Term, 157.

Even in regard to boundaries of parishes and towns, it is only received where such boundary is of remote antiquity.   If it was admissible in this case, I look upon that disclosed by the record as too feeble and unsupported to have any weight in the decision

of the right which is contended for. Besides this, the land is contained in the grant from Governor Micheltoreno to Narvaez. The power of the Mexican government, as I have before shown, was derived from the Decree of 1824, and by the second section of that decree, the lands belonging to a town are expressly excluded. It appears, therefore, that the governor had no right to grant the lands of a Pueblo, and the presumption of law is that he did not do so, unless the facts show affirmatively and clearly that he exceeded his authority.

From the review we have made of this case, we are satisfied that the District Court erred in its decisions and directions. The judgment is therefore reversed, with the costs, and the case remanded.

It is proper, before closing this opinion, to remark, that in the case of Leese and Valejo v. Clarke, decided at this term, the doctrines in that opinion are different from those advanced in this.

Mr. Justice ANDERSON, who united with the Chief Justice in deciding that case, entered a special concurrence as to the judgment rendered, thus reserving himself as to the doctrines laid down in the opinion. He concurs in the principles here maintained, and which, therefore, upon the subjects embraced, must be considered the opinion of the court.