[See Cases Nos. 14,069 and 14,070.]

———

## Case No. 14,069.

### TOBIN v. WALKINSHAW et al.

[McAll. 151.] [1]

Circuit Court, N. D. California. July, 1856.

MEXICAN LAND GRANT—APPROBATION OF DEPARTMENTAL ASSEMBLY — QUANTITY GOVERNED BY SPECIFIC METES AND BOUNDARIES — SEGREGATION.

1. A Mexican grant which had never received the approbation of the departmental assembly, and had never been segregated from the public domain before the treaty of Guadalupe Hidalgo, is not a title on which to maintain ejectment against any save a trespasser.

2. The rule at common law is, that in the construction of a deed, quantity must yield to specific metes and boundaries.

3. Such rule cannot be applied, in all cases, to Mexican grants.

4. The grant in this case is subject to be located at different places, as one or other of the three lines given may be selected as the base line. Such fact precludes any action by the court in this case.

5. Segregation of private from public land is a political act, and belongs to another department of the government.

This is an action of ejectment, brought for the recovery of lands situated in the county of Santa Clara, in this state. A jury trial was waived by the parties, and the case submitted on the law and facts to the court; each party reserving to itself the right of exception to the rulings of the court on the admissibility of the evidence, and to its decisions of the law upon the merits. The evidence offered, and the rulings thereon, with a statement of the facts proved, are given in the opinion of the court.

[See Case No. 14,068.]

Howard & Goold and E. W. F. Sloan, for plaintiff.

Halleck, Peachy & Billings, for defendants.

McALLISTER, Circuit Judge. This action is brought for the recovery of certain lands situate in the county of Santa Clara, in this state. The cause came on to be heard at the present term of this court, a jury trial waived, and the case submitted on the law and facts to the court; each party reserving the right of excepting to the rulings of the court, in relation to the admission of testimony, and to their decision of the law upon the merits. The plaintiff introduced and relied upon the expediente of Jose Reyes Berreyesa, and grant, dated 20th August, 1842, issued to him by Governor Alvarado, for the premises in

---

[1] [Reported by Cutler McAllister, Esq.]

controversy, under which grant plaintiff claimed title. The grant was in the ordinary form of Mexican grants, and had annexed to it their usual conditions.

To the introduction of this testimony the defendants objected on the following grounds: 1st. Because it is no evidence of title on which an action of ejectment can be maintained. 2d. It is no evidence of possession, or its extent, if entry under it is proved. The objections were overruled, and point reserved.

The defendants subsequently gave in evidence an alleged grant from the supreme government of Mexico, of later date than that of Berreyesa's, and an expediente under which they claimed from the Mexican government, a property in a quicksilver mine, alleged to be on the land sued for, and the delivery of which mine to the assignor, under whom the defendants claim, is alleged to have been given in the year 1845. To all this documentary evidence the plaintiff objected. The objections were overruled, and the point reserved. The sheriff's deed to Walkinshaw, one of the defendants, for the interest of one of the heirs of the grantee, Jose R. Berreyesa, was also given in evidence. This was all the documentary testimony which went directly to prove title.

The first question, and which lies at the foundation of this action, arises out of the objections made by defendants to the title of plaintiff. It therefore first demands attention. It is conceded that the grant under which the plaintiff claims, has never received the approval of the departmental assembly, and it is contended by defendants that the title of plaintiff held under it, is therefore inchoate. To ascertain the character of this title, we must look to the Mexican legislation, from which it derived its existence. The supreme executive of Mexico, in accordance with the provisions of the sixteenth section of the colonization decree of the 18th of August, 1824, prescribed certain regulations, under date of 21st November, 1828 [Hall's Comp. Mexican Laws, p. 150, § 503], having for their object the colonization of the lands in the territories of the republic. The first article of these regulations confers on the political chiefs of territories, the power to grant lands, with the restriction that the grants should be issued in accordance with the general law, and under the qualifications therein expressed. The first three of these qualifications are directory, and relate to the class of persons who are to become grantees, and the character of the lands to be granted. The fourth confers on the political chiefs a power to grant or accede to the petition of the applicant, which is the foundation of the grant subsequently obtained. The fifth, sixth, and seventh articles prescribe the mode in which grants are to be made definitively valid; and the eighth provides that after they have been made so, a patent signed by the political chiefs, shall

be issued, which shall serve as a title to the party interested, expressing therein that it had been made in strict accordance with the provisions of the law, by which "they shall proceed to give the possession."

From the foregoing it results:

First.—That although power is given by the fourth article to the political chiefs, to accede or not to the petition, the power to issue a patent or grant is withheld, or rather it is not conferred upon them until after the concession was made definitively valid, by having received the approbation of the departmental assembly.

Second.—That no evidence of title was to be delivered to the interested party until after the issuing of such a patent.

Third.—That it was not contemplated that the party should go into legal possession until such patent shall have been delivered to him; the eighth article declaring it was by virtue of it, and the laws therein expressed to have been observed, that they should proceed to give the possession.

The fifth and sixth articles declare that, in order to render grants definitively valid, they shall receive the previous approbation of the departmental assembly, to which they shall be referred; and in case the political chiefs fail to obtain such approval, they shall report to the supreme government for its decision. Such was the course prescribed by Mexico for the granting of lands in her territories. It is evident that the departmental assembly was intended to be made the depositary of the granting powers to such an extent, that the political chief could alien no portion of the public domain without their previous approbation. To them his action of acceding to a petition for a grant was to be referred, and he was to obtain their approval before he could thus alien, and before the evidence of title could be properly delivered to petitioner.

It seems clear that the supreme government of Mexico never entrusted to one man the uncontrolled power of disposing of the public domain. He was permitted to inquire into the circumstances attending the petition, and accede to its prayer, and thus place the petitioner in a position to obtain a grant; but it was not until after the approval of another department of the government that he was permitted to issue a grant: nor was it, as we have seen, contemplated that a party should go into judicial possession until such approval had been obtained. A policy thus cautious has always characterized the Spanish American governments. In Upper Louisiana, while in a provincial state, although the lieutenant-governor had the right to make concessions, order surveys, and even place grantees in possession, the supervisory action of the intendant-general of Upper Louisiana and Lower Florida was necessary; and until his formal confirmation of the grant previously given, had been obtained, the party interested was deemed to have only an equi-

table title. In Coahuila, although the governor had more ample powers of concession than those conferred upon the political chiefs of California, the confirmation of his acts by the intendant-general was deemed necessary to complete the title of the party. In her legislation relative to the colonization of lands in California, Mexico did not depart from the cautious policy which distinguishes the Spaniard and his descendants. She did not confide to one man the exclusive power of granting, but interposed between him and the exercise of absolute power, the necessity of an approval by the departmental assembly, and in case they did not co-operate with him, an appeal to the home government. The approval of the assembly was made precedent to the issue of the grant.

The practice which prevailed in earlier times in California was in conformity to the law. The decree or concession was made, submitted to the assembly for approval, and then the patent or formal title was issued. Subsequently, it became the ordinary usage for the governor to issue the concession and grant simultaneously, or the latter shortly afterwards, inserting in it a provision that it was subject to the approbation of the junta, as in this case. Such approval was frequently obtained subsequently, and a testimonio, or certificate of the fact, delivered to the party; in many cases, no approval of the junta was obtained. The grantees, however, if they were not in the occupancy of the land, as not unfrequently was the case, would enter into the possession of all the lands described in the grants thus issued, and retain it, although, in many cases, their grants had not received the approbation of the assembly. The Mexican authorities, however, recognized the importance of the approval of the junta, for the governor inserted in the grants a provision expressly subjecting them to the approbation of that body; and, so far as the numerous records of land cases which have come under our supervision show, we are led to the conclusion that the subordinate Mexican functionaries generally acknowledged the necessity of the approval of the junta to constitute title. We find a practical illustration of this in the case of U. S. v. Vaca [Case No. 16,604]. This case is No. 54 on the calendar of the land commissioners, and No. 74 on the docket of the district court.

In May, 1844, Vaca presented his petition to the governor, setting forth, among other things, that he had obtained a grant in the preceding year for a tract of land; that he had solicited the justice of the peace, for his jurisdiction, to give him juridical possession of the place, which had been refused because petitioner had not obtained the approval of the assembly to his grant; and concluded by affirming that the magistrate had overlooked, in some cases, the condition which required the approbation of the junta, and prayed an order from his excellency, directing the said

justice to place petitioner in juridical possession without compelling him to wait for the approval of the assembly. On this petition is the marginal order of the governor, which, as to that portion of the prayer which referred to the juridical possession, states: "With regard to the judicial possession which is claimed in this writing, the government is not authorized to order it to be given without the previous approbation thereof by the most excellent departmental assembly."

It is true, as alleged by the plaintiff, and before stated, that many parties went into possession of lands under grants made expressly subject to the approbation of the junta, and which had not received their approval; and it may be also true that this frequent practice may have induced a belief among many that such approval constituted no part of the title. But no usage or practice of the kind could convert the title, if originally inchoate, into a perfect one. The issuing of the grant by the governor, before obtaining the approval of the junta, with other circumstances, might give the party an equity which would bind the government; but it could do no more. In Menard's Heirs v. Massey, 8 How. [49 U. S.] 293, the party claimed under a grant from the lieutenant-governor of Upper Louisiana. The concession granted the land, dispensed with an immediate survey, but required that when any one settled on the place a survey should be executed, after which the party was to solicit from the intendant-general his title in due form. It was admitted that the lieutenant-governor had a right to deal with the public domain, make concessions, direct lands to be surveyed, and to put grantees into possession. "This, however," say the supreme court, "does not settle the question." A usage also prevailed in Upper Louisiana to which the court refer: "It is remarkable (say they), that if we may trust the best information we have on the subject, neither the governor nor the intendant-general has ever refused to perfect an incomplete title granted by a deputy-governor or sub-delegate." Referring also to the position of Upper Louisiana at the time, the difficulties of intercommunication between its several parts and New Orleans, and the general condition of the country, as the reasons which rendered the completion of the title in due form almost impracticable, they conclude by saying, "There are but two instances known to exist, where the intendant-general was applied to for a complete title." But all this "did not settle the question." "It does not depend (say the court) upon the existence of power, or want of power in the lieutenant-governor. but on the force and effect of the right his concession conferred."

We have not overlooked the fact that there is some difference between the imperfect titles issued by the governor of California, and those by the sub-delegates of Louisiana. In the latter cases the grantees were ex-

pressly referred to the intendant-general to solicit the title in due form. In California, no more formal title was contemplated than that issued by the governor. But that title was not to issue until the concession had been approved. When therefore, it was delivered without such previous approbation, and made expressly subject to it, the situation of the grantee was analogous to the holder of a concession from the lieutenant-governor of Louisiana, in this, that both required the approval and confirmation of other officers or functionaries of the government to render their titles finally valid. If, then, the usage which prevailed in Louisiana, more uniform than that which had been relied on in California, could not change the character of title as originally ascertained by the nature of the right conferred by the concession, so in this case the title of the plaintiff must be fixed by the force and effect of the grant, and the laws of Mexico which gave it birth. This we have done by an analysis of the regulations of 1828, which has conducted us to the conclusion that the title of the plaintiff is merely inchoate. Previous to the citation of authorities to fortify the construction we have placed upon this title, it may be well to notice some suggestion which have been made upon this point.

It is urged that by the governor's grant, the title to the land passed, liable only to be defeated by the refusal of the departmental assembly to approve it. This would be treating the refusal as a condition subsequent, which, on its happening, would defeat a previously vested estate. But the eighth article distinctly shows that it was not intended that a defeasible estate should vest by the governor's concession alone, else, why withhold from the party all evidence of title until after the approval had been obtained. The document issued after such approval was the only evidence of title the law gave him, and without which he could not obtain judicial possession. The argument which attributes the suggested effect to the governor's concession supposed the party to have acquired an estate, without receiving any evidence of title, and when by law he could receive no such evidence nor be placed in legal possession until after the concession had received the approval of the junta. Such construction would defeat the whole policy of the law. If the party acquired by the governor's grant a legal title to the land, which was valid until defeated by the refusal of the junta to approve, the happening of such event could always be prevented by the governor's withholding the expediente from the departmental assembly. If they were never asked to approve, they could have no opportunity to refuse. It was only the governor's grant definitively valid that gave to the party interested a right to receive a documento, or title. and to be placed in legal possession of the land. The refusal of the departmental assembly to approve

it, was not a final bar to the proceedings; the governor was in such event bound to send it to the supreme government for its decision; but it was not until its approval was obtained. and the proceedings consummated by delivery of the documents, that the title passed, to any portion of the land, from the Mexican nation.

Another suggestion has been made. It is, that inasmuch as the governor could not legally deliver the grant to the party interested until he had obtained the approval of the departmental assembly, such approval may be presumed from the delivery of the grant. The expediente in this case discloses no action whatever on the part of the junta, in relation to this grant. Besides, such presumption would have to be made in the face of the fact, disclosed by the archives for years, that the governors always issued the grant before the approval of the junta, as evidenced by the testimonios, or certificates, as to the fact of the approval having been subsequently obtained. Lastly, such presumption is forbidden by the grant itself, which declares on its face, that it is issued subject to the approval of the assembly.

We pass now to the authorities which sustain the conclusion to which an examination of the Mexican legislation has conducted us, in relation to the character of the plaintiff's title.

In U. S. v. Cervantes [Case No. 14,768] my associate gave a construction to the regulations of 1828, and viewed a Mexican grant which had not received the approval of the departmental assembly, as a mere inchoate title. The case was carried on appeal to the supreme court of the United States [18 How. (59 U. S.) 553]; but the construction placed by him on the point under consideration was not reviewed, as the appellate tribunal decided the cause on the rulings made by them in the cases of U. S. v. Fremont [Id. 30], and Arguello v. U. S. [Id. 539]. In U. S. v. Reading [Id. 16,127], Commissioner Hall says: "In the present case, although the claimant had received a formal title from the granting officer, and under it had taken possession of the land previous to the occupancy of the territory by the troops of the United States, and was in the quiet enjoyment of it at the time of the cession by Mexico, yet as something remained to be done to perfect his title, viz.. the approval of the departmental assembly, his title must be held to be an incomplete and imperfect one." In Edwards v. Davis, 3 Tex. 321, the construction of the fourth article of the colonization decree of 18th of August, 1824, which requires the approval of the supreme executive to grants of land within the ten littoral leagues, came incidentally before the court, and they intimated that had the question been properly before them they would have deemed a grant by the governor of Texas and Coahuila a nullity if it had not received the approbation of the supreme government, in compliance with

the law. In the case of Republic v. Thorn, 3 Tex. 499, the question came up and was decided in accordance with the intimation in the preceding case. In Paschal v. Perez, 7 Tex. 349, the test is given by which the character of an inchoate is to be distinguished from that of a perfect title: "An imperfect title is one which requires a further exercise of the granting power to pass the fee in the lands, which does not convey full and absolute dominion, not only against all private persons, but as against the government, and which may consequently be affirmed or disavowed by the political granting power." In Hancock v. McKinney, 7 Tex. 456, the rule is thus stated: "If the title was perfect it would separate the land in controversy, proprio vigore, from the public domain, and the land would cease to be of the vacant land of the state, unless it so became by the terms of the grant, or by some action of the judicial or political authority of the state."

The distinction between perfect and inchoate titles rests on this basis, that is to say: "If the grant was to receive no further act to constitute it an absolute title to the land from the legal authorities, taking effect in præsenti, it is a perfect title, requiring no further action of the political authority to its perfection." "But if there remained anything to be done by the government or its officers, such title or right is imperfect, and until it received the sanction of the political authority, it could not claim judicial cognizance." 7 Tex. 457. Applying these tests to the grant under which the plaintiff claims, we cannot fail to conclude that further action was required from the Mexican authorities, viz., the approval of the departmental assembly to perfect it; in the absence of which the title it conveys must be regarded as imperfect and inchoate, and as such incapable of separating any portion of land from the public domain proprio vigore. It has been urged that the decisions of the supreme court of the United States in the Fremont and other cases, establish that these Mexican grants pass the fee to the land, and constitute such title as will sustain ejectment. Whatever may be the conclusion at which that tribunal may arrive on this point, we see nothing to authorize us to consider that their decisions heretofore made, have gone to the extent contended for. They have determined that these grants pass a vested and immediate interest, and one which should be recognized by a court of equity; and beyond that we do not understand them to have gone. To these grants are annexed certain conditions which are clearly subsequent; and if the title had been complete, the non-performance of them could only have been availed of in the manner prescribed by law for the defeat of legal estates subject to forfeiture. But the titles under the Mexican grants being deemed merely inchoate, were treated as such; and the supreme court enter into a minute examination of the facts of each case with a view to ascertain its equities, and whether the non-performance of subsequent conditions should forfeit the right of the party to have his claim confirmed. It is improbable that if the court had viewed these titles as legal, they would have placed the confirmation of claims under them on equitable grounds.

In the case of Arguello v. U. S. [supra], Mr. Justice Wayne characterizes, in totidem verbis, the Mexican grants which had not received the approval of the departmental assembly, as "equitable titles." For all purposes of this case it is only necessary, regarding them in a court of law, to fix their character as inchoate.

The action of the supreme court of this state, though not very determined, as far as it has gone sustains the conclusion at which this court has arrived, although not for the same reasons. In Leese v. Clarke, 3 Cal. 17, the general principle is affirmed, that a Mexican grant without proof of compliance with the conditions, is at best an inchoate title, and the land passed to the United States, who hold it subject to the trusts imposed by the treaty of cession, and the equities of grantees. This doctrine was reversed in the case of Vanderslice v. Hanks, 3 Cal. 27; but on the rehearing of the former it was reaffirmed. Such has been the doctrine in the highest court of this state since 1852. At the July term, 1856, of the same court, in the case of Gunn v. Bates [6 Cal. 263], two justices presiding, one of them, resting exclusively upon his construction of the decision of the supreme court of the United States, in the Ritchie and Fremont Cases, considered the question no longer an open one, and gave an opinion adverse to the doctrine affirmed in Leese v. Clarke. But the other justice, although he concurred in the decision on other grounds, dissented from the reasons assigned by his associate. He says, "I do not think the plaintiff's title sufficient to sustain an action of ejectment." The doctrines announced in 1852 remain still the exponents of the judicial action of our highest state tribunal.

Upon full examination of the Mexican regulations of 21st of November, 1828, and on the authorities which touch upon the subject, our convictions are, that the title of the plaintiff is inchoate, that the grant under which it is held, segregated no portion of the public domain; consequently, no title to any portion of the land in controversy was divested from the Mexican nation; and lastly, by well settled law, such title gives no standing to the plaintiff in the ordinary tribunals of the country. [Burgess v. Gray] 16 How. [57 U. S.] 48.

It is urged by counsel that if the grant under which the plaintiff claims does not pass a legal estate, it is a colorable title which, accompanied by possession, is sufficient to show the extent of such possession. This principle is applicable to cases where there

is no adverse title, or where the defendant does not dispute the seizin of the plaintiff, and is a mere intruder. An illustration of the application of such principle is to be found in Christy v. Scott. 14 How. [55 U. S.] 282, cited by plaintiff's counsel. The doctrine enunciated there is, that where the plaintiff avers seizin in himself of the premises, and the defendant is a mere intruder, and admits or. what is equivalent in pleading, does not deny the seizin, such intruder may not question the plaintiff's title. "If (say the court) the plaintiff, as his petition avers, was actually seized, and the defendant being an intruder ejected him, it was an unlawful act, and the action is maintainable notwithstanding the state of Texas may have a true title, or may have granted it to another." In the case at bar, the defendants deny the seizin of the plaintiff, and that is an issue to be tried. The plaintiff seeks to establish for himself such seizin by the adduction of a colorable written title, and proof of possession, in the face of an adverse title. In the cases where a plaintiff. may thus recover, the defendants are without color of title—mere intruders. But where the defendants show an adverse title, the party must, as the plaintiff has done in this case, rely upon his title-deed. Can the defendants be fairly deemed to be mere intruders without color of title? They claim title from the same source whence the plaintiff derives his. That title may upon investigation prove invalid; but surely those who have gone into possession under claim of title, and have expended large amounts of money on the faith of such title, cannot be considered as intruders, and as such estopped from questioning the title of him who seeks to dispossess them. Independent of an entry under claim of title, there are circumstances in this case which divest the entry of the character of an eviction.

José Fernandez, a witness, swears he was present with others, when judicial delivery of the mine was given to the assignor of the defendants; that during a portion of the time, Berreyesa, the grantee under whom plaintiff claims, was present; that when informed they were delivering possession of the mine, he said, "he did not care for the lomas, but he wanted the valley lands." Another witness, Antonio Suñol, confirmed the foregoing. Such was the character of the original entry, with at least the apparent authority of a Mexican functionary. under the forms of law, and with no objection made by the grantee. This took place in 1845; since then, the defendants, claiming under that judicial act, have been working the mine, thus delivered to their assignor in the presence of the grantee under whom the plaintiff claims. We allude to this testimony solely with a view to show that defendants cannot be regarded as mere trespassers, and thus make their case an exception to the general rule, which demands that the plaintiff must recover on the strength of his own title. Upon the validity of defendants' title, we do not consider we are called on to decide until the plaintiff's right to sustain his action against tnem be established. If we have not ascertained the character of the plaintiff's title to be inchoate, and therefore not the subject of ordinary judicial cognizance, the inquiry arises, whether, if a legal title passed to the land by the grant, it is in this case in the power of the court to locate the granted premises. If a fee passed, did it attach to all the land included in the boundaries named in the grant, or to the one league it was intended to convey?

It has been urged that, by the terms of the grant, all the lands to the extent of the boundaries mentioned, ascertained by the evidence to be from two to two and a half leagues, vested in the grantee without regard to quantity, which is stated in the grant io be one league; and this, it is contended, is the correct construction of the grant. It is true, that where a conveyance of land is made with specific metes and bounds, although the ambit includes a larger quantity than that mentioned, in the construction of the conveyance mention of quantity is made to yield to boundaries; and it is held that the whole land passes to the grantee. This is a familiar principle of the common law; but its applicability to the case at bar is not perceived. The rule at common law rests upon the presumed intention of the parties; and in order to carry that intention into effect, in the absence of other proofs on the face of the conveyance, the court will reject quantity in favor of boundaries. Hence, where the latter are so specific and distinct as to indicate with certainty the identity of the land intended to be conveyed, the mention of quantity must yield to boundaries that are thus specific; the latter being deemed more convincing proof than the former, of the identity of the land intended to be conveyed. In this case, quantity is not mere matter of description. It enters into and is inseparable from the thing granted. There are two conditions annexed to the grant, and forming a part of it. The second condition requires the party to solicit the respective justice to give judicial possession, by whom the boundaries should be marked out, &c. Whence the necessity of having the boundaries marked out, if they had been so designated in the grant that the land intended to be conveyed could be identified? The third condition stated that the land of which mention is made, is one league, referring to the diseño, and prescribes that the justice who may give the possession, will have it measured conformably to ordinance, leaving the surplus to the nation, for the uses which may suit. There was not necessity for any provision in the grant for measurement, nor would there have been a reserve of the surplus, had it been intended to convey the

whole. So far from the grant operating to pass to the grantee a right of possession to the whole, the ordinance to which reference is made in the grant shows that no right of possession passed under the grant, proprio vigore. One of the articles expressly declares: "That no person, although he may have an older grant than others, can himself take possession, survey, or mark out his landed property, unless by judicial authority, and by citation of his neighbors; therefore whatever is done otherwise shall be null, of no value or effect." Ordinanzas de Tierras y Aguas, 94.

There can be little doubt that the interest intended to be conveyed was to a certain quantity of land; and the name of the ranch of which it formed a part, and its general boundaries, given to indicate the tract from which that quantity was to be taken by the agent of the grantor and, after such segregation, possession thereof delivered by him to the grantee. By reference to the expediente of the plaintiff, it will be seen he was aware of the quantity of land conveyed in his grant. By a petition presented by him on the 10th of February, 1844, to the governor, he stated that he had received a grant, and had returned it because it had subjected him to one league, whereas he had solicited two; and he requested that a dispatch might be sent him for two leagues. So far as the evidence goes, there is no reason to suppose his prayer was acceded to; and the grant under which plaintiff claims is believed to be the one once repudiated by him, because it subjected him to one league. On this petition there is an indorsement by M. Jimeno, the secretary, which shows the views entertained of the grant by the Mexican authorities. It recites that: "To the person representing these, was granted a single league, as is shown in the respective expediente; and if his pretension is to have more extension, it would be proper for the justice of the pueblo of San Jose to make report, after summoning the adjoining neighbors, especially the neighbor Justo Larios, with whom he formerly had a dispute "

We have heretofore had occasion to express our views in relation to the system of granting lands which formerly existed in California. Neither the grantor nor the grantee had the means of defining quantity by measurement No actual surveys, under the Mexican rule, have come to the notice of this court; and we believe the true condition of things as it existed, is correctly stated in the instruction by the department of the interior of the United States to the board of commissioners, on the 11th September, 1851: "There are, it is believed, no Spanish or Mexican plats of survey extant, of lands in California; no actual surveys, so far as this office is advised, having ever been executed during the sovereignty over the country of either Spain or Mexico." Under this state of affairs, metes and boundaries were inserted in the grant merely to indicate the general locality, from which the number of leagues conveyed were intended to be taken. The grantor presented a rude sketch, dignified with the name of a diseño or map, on which certain outward boundaries were described, without regard to distances, and in some instances without true indications as to their bearings, the prominence of which objects seemed to have been the inducement for calling for them. Within these exterior boundaries was the land needed; and the petitioner. in his application for it, described it in effect as so much land bounded by those exterior limits; and by such description it was granted. The grantor, equally ignorant of quantity, guarded the public interest by specifying the number of leagues granted, reserving the surplus to the nation, and protecting that surplus by securing its segregation before the owner could obtain legal possession of the land granted. In a word, conjectural estimates were substituted for actual surveys; and in such a system the mention of quantity, as a word of limitation, is more significant than in a common-law conveyance.

To apply rules of construction which regulate the system of common-law conveyancing, in all cases, to one so anomalous as that which existed in California, would be impracticable, and defeat the object at which the common law aims viz., to carry out the intention of the parties. The rule of construction as laid down by the supreme court of the United States is, that the words of a grant are always construed according to the intention of the parties, as manifested in the grant by its terms, or by reasonable and necessary implication, to be deduced from the situation of the parties and the thing granted. [U. S. v. Arredondo] 6 Pet. [31 U. S.] 740. Submitted to this test, we cannot consider that the whole land passed in this case.

We have not overlooked the fact that it was customary to annex similar conditions, as to quantity, to Mexican grants indiscriminately. To those where no surplus of land could exist, as well as to those where the quantity included in the general locality greatly exceeded that intended to be granted. But such usage affords no good reason to regard all conditions as to quantity, annexed to every species of grant, as formal and inoperative. In one class of cases, while the insertion of such conditions evidence an intention to reserve a portion of the land included in the outward boundaries. such evidence is rebutted by the fact that no surplus could remain, or was contemplated to exist. In the other, the existence of a large surplus over the amount intended to be granted, clearly evidenced that there was something more than form which led to the annexation of conditions as to quantity. In each class of cases it is the duty of the court to apply the rule of construction given by the supreme court of the United States, that a

grant is to be construed according to the intention of the parties, as manifested by the words of the grant, aided by reasonable implication, deduced from the situation of the parties and the thing granted. [U. S. v. Arredondo] 6 Pet. [31 U. S.] 740. We do not desire to be understood to mean, that when land is sufficiently described by boundaries, and the quantity of land included within them approximates to the number of leagues granted so nearly that the excess might be deemed to be covered by the words "more or less,"—that we would give to the conditions annexed to such a grant, restricting quantity, the consideration we feel constrained to give to cases where there is a large excess over the quantity intended to be conveyed.

· All that has been said in relation to the question whether the whole land described in the grant, in this case, passed to the grantee, has been predicated upon the assumption that a fee passed on the execution of the grant to the grantee. But our conclusion, as above stated, is that the grant, never having been executed by the granting power, according to law, divested no portion of the land from the Mexican nation, and consequently passed no legal estate to the grantee, on which this action can be sustained.

In the view entertained by the court on this point, it is perhaps unnecessary to consider the remaining suggestions of plaintiff's counsel, in relation to the location of the granted land. But it has been argued with zeal by counsel. and demands, for that reason. some attention. It is urged, that if the whole land did not vest in the grantee, the plaintiff is entitled to one league; and that the land is sufficiently described to enable the court to locate it. That the western boundary, the dividing line between the ranchos of Berreyesa and Justo Larios, is sufficiently defined; and. making it the base line, the league may be run off. Days have been consumed in ascertaining how this line should be run; and after the closest examination it is not found to be more certain than the northern line; and this latter is the boundary first named in the grant, whereas the western is the last one called for. Between these two lines. a selection may be attended with serious consequences to the respective parties. a selection we do not think within the appropriate province of this court to make.

It is evident. that the grant is subject to be located at different places by the selection of different base-lines; and such fact precludes the action of this court.

In Stanford v. Taylor, 18 How. [59 U. S.] 409, the concession was for forty by forty arpens in extent, along the river "Des Peres," from the north to the south, which is bounded on the one side by the lands of Louis Robert, and on the other by the domains of the king, &c. The supreme court say. in relation to this concession, which had been confirmed and thus become a perfect title:

"On which side of Louis Robert's land it is to lie, we are not informed further than that it is to lie along the river from north to south. The uncertainty of out-boundary in this instance is too manifest. in our opinion, to require discussion to show that a public survey is required to attach the concession to any land." The decision in this case turned upon the point that the land admitted of two locations. It is settled law that—"where a claim to a specific tract of land has been confirmed according to ascertained boundaries, the confirmee takes a title on which he may sue in ejectment; but where the claim has no certain limits, and the judgment of confirmation carries along with it the condition that the land shall be surveyed and severed from the public domain and the lands of others, then it is not open to controversy that the title attaches to no land; nor has a court of justice any authority in law to ascertain and establish its boundaries. this being reserved to the executive department." [Stanford v. Taylor] Id.

The one league of land in this case, from the description of the outward boundaries, admits of different locations; and the grant itself carries with it a condition calling for a survey. The interposition. therefore, of the executive is necessary to give a separate existence to the specific land to which the estate can attach. [Ledoux v. Black] Id. 473. The right of the plaintiff is a jus ad rem, not a jus in re. He is certainly entitled to one league of land, but he is entitled to it on the terms mentioned in his grant: the league was to be severed by the grantor. The law which existed at the time of the grant and referred to by it declared. as we have seen, any possession a nullity unless previously measured by the proper officer of the government. No public survey of the land had been made anterior to the treaty of Guadalupe Hidalgo. By that instrument the land passed to the United States, subject to the plaintiff's right, and with it passed also the right of segregation. This is a political act, and belongs not to this court.

In Fremont's Case, the supreme court say: "Under the Mexican government, the survey was to be made or approved by the officer of the government, and the party was not at liberty to give what form he pleased to the grant. * * * The right which the Mexican government reserved, to control this survey, passed with all other public rights to the United States; and the survey must now be made under the authority of the United States; and in the form and divisions prescribed by law for surveys in California. embracing the entire grant in one tract."

But setting aside all considerations in relation to the power of this court to locate the granted premises, we place our decision on the ground that the documentary title produced by the plaintiff himself must control his rights. and that under it no legal estate passed which can maintain the present ac-

tion. The attorneys for the defendants will submit the draft of a verdict in favor of the defendants for the signature of the judges.

[See Case No. 14,070.]