[No. 820.   February 26, 1903.]

## THOMAS B. CATRON et al., Appellants, v. SARON N. LAUGHLIN et al., Appellees.

### SYLLABUS.

1.   The action of Congress in confirming a claim for land under a grant made by Mexico is to be treated as an adjudication, and the courts cannot revise what has been done by Congress.   .

2.   Where the surveyor-general of New Mexico had declared a Mexican land grant presented to him to be a good and valid one, and recommended its confirmation without limitation as to quantity, and Congress has confirmed the grant as recommended, the

confirmation is a declaration by Congress that the title is valid for all the land claimed.

3. In such a case, while the courts cannot go back to the original grant for the purpose of passing upon its validity, yet they may do so merely to ascertain whether it purported to convey absolute title to the land, as a means of ascertaining the full scope of the adjudication by Congress.

4. In the present case, the original grant by its words of conveyance purports to give complete title, and it is therefore held that Congress by the confirmation adjudicated the title to be perfect. `

5. Where Congress has confirmed a grant to such of the grantees as had not forfeited their rights by non-compliance with the conditions of the grant, the possible forfeiture indicated must have taken place prior to the acquisition of the country from Mexico, and can be shown only by proof of denouncement and some official action thereon, under the former government; and the burden of showing such forfeiture is upon the party alleging it.

6. There is no proof in this case to support the finding of the court below that the appellees had title to the grant in controversy by adverse possession against their cotenants.

Appeal from the district court of Bernalillo county, before HON. N. C. COLLIER, Judge. Reversed and remanded.

THOMAS B. CATRON for appellants.

The penalty attached to the sale of the property, or the attempted restriction of its sale, was void.

Freemont v. U. S., 17 How. 561.

One cotenant can not be disseized of any particular part of the land unless all the others are disseized.

Porter v. Hill, 9 Mass. 34; Buswell on Lims. and Adv. Pos., sec. 303.

It is held that the relinquishment and yielding up by the disseizor to one of several tenants in common, after disseizin of all the right, seizin, possession and betterments, which the disseizor had in or to the property of that tenant in common, had the effect to put all the tenants in common into the seizin and possession, of their shares respectively, and prevent the operation of the statutes of limitation thereafter against them.

Vaughn v. Bacon, 15 Me. 555; Farrar v. Eastman, 10 Me. 191.

The rule of law is that where a written instrument is the foundation of a pleading, and is made an exhibit, its statements will control the other allegations of the pleading.

Dunlap v. Eden, 44 N. E. 560; Murphy v. Harris, 57 Ill. App. 351; Crandall v. Bank, 61 Ind. 354; Parker v. Teas, 79 Ind. 388; Hines v. Driver, 100 Ind. 317; Avery v. Dougherty, 102 Ind. 445.

And if an exhibit be attached to a complaint or petition and referred to therein, it becomes as much a part thereof as if it were expressly made a part.

Savings Bank v. Burns, 38 Pac. 102.

A specific description in a deed controls and limits the general description.

Railroad v. Green, 68 Mo. 169; McEveen v. Lewis, 26 N. J. L. 451; Barney v. Miller, 18 Iowa 460; Gans v. Aldridge, 27 Ind. 294; Bratton v. Clausen, 3 Strob. L. 127; Thorndike v. Richards, 13. Me. 430; 2 Dev. on Deeds, 1039 and authorities cited.

The confirmation by Congress of a title, is a recognition of the pre-existing right or title. Such confirmation relates back to the right or title, and to the inception thereof. A confirmation does not create or make any title or grant *de novo*.

U. S. v. Joseph, 94 U. S. 618; Tripp v. Spring, 5 Sawy. 215; Slidell v. Grandjean, 111 U. S. 439; Langdean v. Haynes, 21 Wall. 521; Mitchell v. Handfield, 33 Mo. 439; Teschemacher v. Thompson, 79 Am. Dec. 156, 18 Cal. 11; Ross v. Barland, 1 Pet. 664; Landes v. Brant, 10 How. 372.

The Supreme Court of the United States has decided that no forfeiture can happen or be authorized for any act or fault after the treaty.

U. S. v. Sutter, 21 How. 178.

A denouncement is either a judicial proceeding, wherein a decree of forfeiture is allowed and the property given to another individual, or it is a legislative proceeding instituted by the government itself, wherein the government by legislative act resumes the property.

Freemont v. U. S., 17 How. 561; Hornsby v. U. S., 10 Wall. 240; Vanderslice v. Hanks, 3 Cal. 43; Merle v. Matthews, 26 Cal. 478; Hihn v Peck, 30 Cal. 289; Ferris v. Coover, 10 Cal. 689.

The mere breach of conditions subsequent does not *ipso facto* effect a reverter of the title until the proper steps are taken to consummate the forfeiture.

Rudy v. Rock Island, 97 U. S. 693; Ferris v. Coover, supra.

Provisions for forfeiture of vested rights, whether in statutes or contracts, are not favored, and are, as they ought to be, construed as strictly or as liberally as possible against the forfeiture.

People v. Perry, 79 Cal. 112. To the same effect are Clary v. Folger, 84 Cal. 316; Belcher v. Defarrari, 62 Cal. 106; Von Schmidt v. Huntington, 1 M. M. R. 284, 1 Cal. 55; McKnight v. Kreutz, 1 M. M. R. 305, 51 Penn. St. 232; Oreamuno v. Uncle Sam Co., 1 M. M. R. 35, 1 Nev. 215; U. S. v. Sutter, supra.

See also Schulenburg v. Harriman, 21 Wall. 44.

Decisions of the Land Department on questions of fact within its jurisdiction are conclusive.

Johnson v. Towsley, 13 Wall. 72; Shepley v. Cowan, 91 U. S. 330; Moore v. Robbins, 96 U. S. 530; Quinby v. Conlan, 104 U. S. 420.

But decisions from the Land Department may be reviewed as to questions of law involved.

Aiken v. Ferry, 6 Sawy. 79; Wisc. C. Rd. Co. v. Forsythe, 159 U. S. 46.

It is respectfully submitted that Gildersleeve, being

a tenant in common, his purchase at tax sale, if any, was simply under the law, a payment of the taxes for and on behalf of his associates in title.

Blackwell on Tax Titles, 571-2; Lewis v. Robinson, 10 Watts 354; Williams v. Gray, 3 Me. 207-8; Brown v. Hogle, 30 Ill. 119; Dubois v. Campu, 24 Mich. 360; Page v. Webster, 8 Mich. 263; Butler v. Porter, 13 Mich. 292.

The plea of the statute of limitations in order to prevail should be sustained by absolute, clear and convincing evidence, of sole and exclusive adverse possession.

101 Ill. 581; 5 Wheat. 116; 76 Ind. 24; Stonestreet v. Doyle, 75 Va. 256; 16 Nev. 261; Teal v. Terrill, 58 Tex. 257; Ricard v. Williams, 7 Wheat. 121; Lloyd v. Goring, 2 H. and McH. 234; 13 S. and R. 256; 5 Mass. 244; 5 Cowen 483; 30 Mo. 272; Challifaux v. D———. 8 Wis. 287; Jackson v. Tibbets, 9 Cowan 24; Catlin v. Kidders, 7 Vt. 12; 61 Iowa 447.

Concerning the operation of the statute of limitations as applied to this case see also

Buswell on Lim. and Adv. Pos., p. 258; Jackson v. Woodruff, 1 Cowen 286; Jackson v. Richards, 6 Cowen 623; Hunter v. Crisman, 6 B. Monroe 463; Chandler v. Spear, 22 Vt. 388; Speary v. Ralph, 14 Vt. 400.

It is a rule of law that each cotenant holds possession for all the other cotenants if he has more than one.

Buswell on Lims. and Adverse Pos., sec. 296; 1 Litt. 288; 2 Cruise, Dig. 497; Redding v. Royston, 2 Salk. 423; Martin v. Smith, 5 Binn. 22; Caruthers v. Dunning, 3 S. and R. 293; Hoffstetter v. Boonville, 8 Mo. 276; Dolittle v. Blakesly, 4 Day 465; Branitz v. Casey, 7 Cranch 457.

And see also Brooks v. Fowle, 4 N. H. 248; Nicholson v. Caress, 6 Ind. 24.

Catron v. Laughlin.

It is an established rule that all acts done by one cotenant are taken to be done for the interest and in conformity to the rights of all others, until a notorious adverse possession is set up and established by competent proof.

> Baker v. Whiting, 3 Sumn. C. C. 375; Williams v. Gray, 3 Me. 207.

And one cotenant cannot be disseized of any particular part of the land unless all are.

> Porter v. Hill, 9 Mass. 34.

The relinquishment by the disseizor to one of several tenants in common, after a disseizin of five years, had the effect to put all the tenants in common into the seizin and possession of their shares respectively, and to prevent the running of the statute of limitations thereafter against any of them.

> Vaughn v. Bacon, 15 Me. 455; Farrar v. Eastman, 10 Me. 191; Buswell on Lims., 303.

It is a rule of law that needs no citations that when a person claims title by prescription or limitation, he must prove what is necessary to establish that title unequivocally and by a preponderance of the evidence.

> Bergere v. U. S., 168 U. S. 79; Whitney v. U. S., 167 U. S. 529, 546.

It has been established in several cases, that the statute of limitations does not begin to run until the title is consummated, and that that consummation is the issuance of patent.

> Henshaw v. Bissell, 18 Wall. 255.

The rule of law is non-varying that where in the taking of depositions, a witness refuses to answer a material question propounded to him, and nowhere does answer it in his testimony, his testimony must be excluded.

> Smith v. Griffiths, 3 Hill. 339; Kissan v. Forest, 25 Wend. 651; Fulton v. Golden, 28 N.

J. Eq. 37; Nicholson v. Desorby, 14 La. Ann. 82; Williams v. Turner, 7 Ga. 384.

W. B. CHILDERS and H. L. WALDO for appellees.

The confirmation by Congress made this a grant *de novo*. The act of confirmation is what determines the rights of the parties.

> Ryan v. Carter, 93 U. S. 82; Tomeling v. Freehold, etc., Co., 93 U. S. 663, 21 Fed. 19, 26 Fed. 119; 121 U. S. 325; Botilier v. Dominguez, 130 U. S. 238; Pinkerton v. Ledoux, 129 U. S. 346.

The patent does not add to or subtract from the interest vested by the confirmation.

> Morrow v. Whitney, 95 U. S. 555; Ryan v. Carter, supra; Whitney v. Morrow, 112 U. S. 693.

The patent is but the evidence of a grant, and the officer who issues it acts ministerially and not judicially.

> U. S. v. Stone, 2 Wall. 535; Stoddard v. Chambers, 2 How. 284.

Patents issued by officers having no authority to issue them, or for land to grant which there is no authority, are void.

> Morton v. Nebraska, 21 Wall. 660; Polk v. Wendell, 9 Cranch 87; Same v. Same, 5 Wheat. 293; Stoddard v. Chambers, 2 How. 284; Stone v. United States, 2 Wall. 525; Bernier v. Bernier, 147 U. S. 247.

If by mistake, inadvertence or other cause the patent has been issued to the wrong person, such person will be declared the trustee of the true owner, and decreed to convey the title to him.

> Bernier v. Bernier, 147 U. S. 247; Stork v. ————, 6 Wall. 402; Railroad v. Whitney, 132 U. S. 368; Merritt v. Cameron, 137 U. S. 552; Robinson v. Downing, 127 U. S. 607; U. S. v. Alger, 152 U. S. 384; Swift v. U. S., 105 U. S.

691; U. S. v. Graham, 110 U. S. 619; especially, Wilcox v. Jackson, 13 Peters 511, and Irvine v. Marshall, 20 How. 558.

In McMicken v. United States, 97 U. S. 214, the court said among other things: "This court has in several cases maintained the doctrine that an actual entry or office found, is not necessary to enable the government to take advantage of a condition broken, and to resume the possession of lands which have become forfeited."

> U. S. v. Repentigny's Heirs, 5 Wall. 211; Schulenberg v. Harriman, 21 Wall. 44; Farnsworth v. Railroad, 92 U. S. 49; McMicken v. U. S., 97 Wall. 218; U. S. v. Hughes, 13 How. 1.

The patent leaves the interests of the allottees, to be subsequently determined by the courts, and until rendered definite the grant is void for uncertainty.

> Slidell v. Grandheon, 111 U. S. 412, 438-439.

The rights of these allottees under the Spanish and Mexican governments were inchoate only. The patent so treats them. Compliance was necessary. The political department of the government had uncontrolled discretion to deal with them.

> United States v. Santa Fe, 165 U. S. 675; Ainsa v. United States, 161 U. S. 208.

On necessity of allottees to show compliance see

> United States v. Wiggins, 14 Peters 335.

The party who sets up title must furnish the evidence necessary to support it. If the validity of a deed depends upon any matter *in pais,* the party claiming under that deed, is as much bound to prove the performance of the act as he would be bound to prove any matter of record on which its validity might depend.

> Williams v. Peyton, 4 Wheat. 79; Thatcher v. Powell, 6 Id. 127; Ransom v. Williams, 2 Wall. 313.

The evidence does not show that anyone of the allottees had complied. Hearsay and tradition are not sufficient evidence to establish such a fact.

1 Greenleaf on Evidence, secs. 129-133, 137.

Possession of land by a party claiming it as his own in fee is prima facie evidence of his ownership.

Recard v. Williams, 7 Wheat. 59.

If a man enter into land having title, his seizin is not bounded by his actual occupancy, but is held to be coextensive with his title; but if a man enter without title his seizin is confined to his possession by metes and bounds.

> Green v. Liter, 8 Cranch 250; especially
> Ewing v. Barnett, 11 Peters 41; Hunt v. Wick-
> liffe, 2 Peters 212; Green v. Liter, supra.

Without title posession is limited to the bounds of the actual occupancy.

> Barr v. Gratz, 4 Wheat. 215; Gregg v. For-
> syth, 24 How. 179; Dredge v. Same, 2 Black. —.

An entry is an ouster according to the extent with which it is made. If under color of right it is an ouster; otherwise a trespass only.

> Lessee of Clark v. Courtney, 5 Peters 319;
> Society for Propagating the Gospel v. Town of
> Powlet, 4 Peters 480-504; especially Lessee of
> Ewing v. Barnett, supra, (Co-op. Ed.), note.

A purchaser without notice may join his adverse possession with the ostensible adverse possession of his grantor to make a barr.

> Alexander v. Pendleton, 8 Cranch 462.

See also Crews v. Buchanan, 1 Black. 362.

A patent reserving the rights of persons, claiming under certain statutes, will not prevent the statute of limitations running in favor of the patentee against persons claiming under those statutes.

> Meehan v. Forsythe, 24 How. 175; 22
> Myers' Fed. Dec. Limitations, sec. 623 (Co-op.
> Ed.).

The patent relates to the inception of the right so far as it may be necessary to cut off intervening claimants.

Stark v. Starr, 6 Wall. 402; Lessieur v. Price, 12 How. 59; Gibson v. Choteau, 13 Wall. 92; Shipley v. Cowan, 91 U. S. 330.

Lost deeds not recorded are not good as to subsequent purchasers, unless notice is shown.

Findley v. Hinde, 1 Peters 241; Dembitz on Land Titles, 987.

As to proof of last deed by parol.

Edwards v. Noyes, 65 N. Y. 127; Metcalf v. Benthuysen, 3 N. Y. 425; Abbott's Trial Evidence, 709; Stebbins v. Duncan, 108 U. S. 32.

The copies from the surveyor-general's office and the letter of transmittal are admissible.

U. S. v. Purchemon, 7 Peters 85; U. S. v. Wiggins, 14 Peters 346; U. S. v. Terchmaker, 22 How. 405; Romero v. U. S., 1 Wall. 742.

Unless title from the government is shown there is no right to recover.

Pinkerton v. Ledoux, 129 U. S.; Bontilier v. Domingues, 130 U. S. 238.

The survey, after it was made, controls as to whether land is inside or outside the grant, and when patent is issued it relates back to act of confirmation.

Stoneroad v. Stoneroad, 158 U. S. 240.

The burden of showing that the original grantees outside of Eaton had not forfeited is thrown upon them.

Williams v. Peyton, 4 Wheat. 79; Whitney v. Morrow, 112 U. S. 693.

APPELLEE'S SUPPLEMENTAL BRIEF.

At all events unallotted lands were subject to the disposition of the government.

U. S. v. Sandoval, 167 U. S. 278, 283, 297-8; U. S. v. Santa Fe, 165 U. S. 675.

"The act of Congress operated as a grant *de novo* for all the land within the boundaries, as given in the report of the surveyor-general."

Tameling v. Freehold Co., 93 U. S. 644; U. S. v. Maxwell Land Grant Co., 19 Fed. 19, 26 Fed. 119-122.

See also Williams v. Peyton, 4 Wheat. 79; Thatcher v. Powell, 6 Wheat. 127; Ransom v. Williams, 2 Wall. 313; Whitney v. Morrow, 112 U. S. 693.

It is well settled that the party having the better title is in constructive possession of all the land not occupied in fact by his adversary. If then the plaintiffs in this case have the better title, that title is barred by the possession of the defendant, so far as that possession was actual but no farther.

Hunt v. Wickstiff, 2 Peters 212; Pinkerton v. Ledoux, 129 U. S. 346; Botillier v. Dominguez, 130 U. S. 238; Astiazaran v. Santa Reta Min. Co., 148 U. S. 80.

When an entry is made under a junior patent as against a senior patent, the junior patentee is limited to the land actually occupied.

Green v. Liter, 8 Cranch 230; Hunt v. Wickstiff, 2 Peters 201; Ellicott v. Pearl, 10 Peters 412; Hunnicutt v. Peyton, 102 U. S. 368; Brobst v. Brock, 10 Wall. 519; Smith v. Gale, 144 U. S. 509; Deputon v. Young, 134 U. S. 241; Harpening v. Rumford Dutch Church, 16 Peters 455.

Notice conveyed by recorded deeds.

Crews v. Burcham, 1 Black. 352; Brown v. Jackson, 3 Wheat. 449; Parker v. Kane, 22 How. 1; 20 Am. and Eng. Ency. of Law, p. 594.

A conveyance of land in the actual adverse possession of another, by a person out of possession is void.

Salazar v. Longwell, 5 N. M. 548; Browning v. Browning, 3 N. M. 659; Montreville v. Baker, 131 Mass. 436.

Where does the statute of limitations begin to run?

Glasgow v. Baker, 128 U. S. 560; Glasgow

v. Hortez, 1 Black. 595; U. S. v. Hancock, 133 U. S. 193.

A finding of the trial court based upon conflicting evidence will not be disturbed.

> Holman v. Bell et al., 30 S. W. 599; Beckell v. McAleer et al., 53 N. W. 374; Loring v. Attermury, 39 S. W. 773; Walrod v. Flanigan et al., 39 N. W. 645; Richardson v. Payne, 30 S. W. 879; Metropolitan Nat. Bank of Pittsburg v. Rogers, 53 Fed. 776; Medler v. Hotel and Opera House Co., 6 N. M. 331; Newcomb et al. v. White et al., 23 Pac. 661; Huntington v. Moore, 1 N. M. 503.

PER CURIAM.—The bill of complaint in this cause was filed by complainants, T. B. Catron and Nicolas Pino against Saron N. Laughlin, C. H. Gildersleeve, and the unknown heirs of certain deceased persons, praying for the establishment of their estate in a grant of land now known as the Eaton grant, against the adverse claims of the defendants known and unknown. It further prays that complainants' title be quieted; that a conveyance from defendant Gildersleeve and wife to the defendant Laughlin be declared void and inoperative as against complainants' estate and undivided interest; that the interest of all the parties to the suit in said grant be ascertained and declared for a partition thereof and for general relief. The bill alleges that in the year 1827 the Republic of Mexico granted and delivered in actual possession unto Domingo Fernandez and twenty-six other persons, naming them, a certain tract of land now wholly situate in Santa Fe county, and gives the boundaries of the grant. The bill also alleges that the surveyor-general of New Mexico examined and approved said grant, and in his decision and report to the Congress thereon, which is known as Report No. 16, recommended to Congress the confirmation of the said grant to E. W. Eaton as the assignee and legal representative

of Domingo Fernandez, and to the remaining original grantees who had not forfeited their right to the said land by a non-compliance with the conditions of the grant.

The bill further alleges that on the twenty-first day of August, A. D. 1827, certain of the arable land included within the said granted lands was distributed and allotted to the said Domingo Fernandez, the arable bottom lands from the Mesita of Lagunitas upwards, as far as the spring of La Vaca, and the remainder of said arable lands in the said bottom and adjoining the said Mesita were distributed in strips measuring one hundred varas each from east to west to and among twenty-five persons in severalty, giving their names. The bill then alleges that said lands so distributed in severalty form a narrow strip not exceeding in any part one half mile in width and are not hereby sought to be affected by this suit, except for the purpose of ascertaining and locating the same by metes and bounds so far as the same are susceptible of ascertainment and location, and except for the further purpose of declaring the distribution and allotments invalid and of no effect so far as they cannot be so ascertained and located. It further alleges that by an act of Congress approved June 21, 1860, the said grant as recommended by the surveyor-general in his said report, was confirmed; that thereafter, on the eighth day of December, 1880, patent for the same was duly issued reciting the said report and confirmation, whereby the United States granted the said land as the same had been completed and surveyed under its authority unto the said E. W. Eaton, and the remaining original grantees who had not forfeited their right to the land by non-compliance with the conditions of the grant, his and their heirs and assigns. It further alleges that at the time of the said report, confirmation and patent the said Eaton had acquired by purchase the undivided share or interest of the said Fernandez in said grant, and alleges said undivided interest to be one twenty-

sixth part of said grant, and that the remainder thereof. belonged to the other grantees named therein, being the only remaining original grantees of said grant who had not forfeited their right to said land by non-compliance with the conditions of said grant. The bill then alleges that the complainants are seized and possessed of thirty-seven undivided fifty-second parts of all of said grant in equal shares, and that the said complainants acquired their shares and interest in said premises by purchase, and that they so acquired all the original shares of nineteen of said alleged original grantees, and that they own the said undivided interest so acquired as tenants in common with the defendants. It further alleges that the defendant Charles H. Gildersleeve on the ninth day of April, 1890, conveyed to the defendant Laughlin by recorded general warranty deed dated on said date, for the consideration of $1,000 all of said tract of land, except the portion thereof conveyed by E. W. Eaton and wife to said Laughlin on May 7, 1874, which deed they allege was in fact a security and mortgage for a loan; that the same is a cloud upon complainants' title. It then further alleges that the defendants both known and unknown make some claim adverse to the estate of the complainant as set forth in the bill, to said grant.

To the bill the said defendants Laughlin and Gildersleeve filed pleas of the statute of limitations, alleging that they had been in sole, exclusive, continuous, actual and visible possession of said land for more than ten years prior to the bringing of said suit, and that said lands had been granted in 1827, by the Republic of Mexico to Domingo Fernandez, through whom they claimed title and tracing their title from said Fernandez through A. W. Reynolds and E. W. Eaton, and alleging further that the said complainants and those under whom they claim had failed to bring suit for the recovery of said land for more than thirty years. The defendants also filed an answer in which they deny that the said lands were delivered into the actual possession or otherwise

·of the twenty-seven persons named in said bill, or any of them other than the said Domingo Fernandez and that at the time of the delivery of the possession of said lands to Fernandez with his consent twenty-four of the persons naming them mentioned in the bill were each put in possession of small strips of land as alleged in said bill and that said persons were by the consent of said Fernandez so put in possession upon the express condition that they should actually occupy and cultivate the lands delivered severally to them and that upon failure to do so, their rights and claims should be regarded as abandoned and forfeited, and that such persons were not granted or put in possession of any other portions of said lands than said small portions as aforesaid, and further alleging that the said persons so put in possession, abandoned the possession of said parcels of land, set off to them, and refused to occupy and cultivate the same in the year 1829; and that each and all of them after said abandonment were ordered and directed in 1829 by the constitutional justice of the city of Santa Fe to proceed to occupy and cultivate said lands so set off to them. The answer further alleged upon information and belief that none of said persons complied with said order but that each and all of them refused to occupy and cultivate said lands or any part thereof, and thereupon said Fernandez, being in possession of all of said parcels of land, and also in possession of the lands contained within the boundaries of the grant, continued so in the sole and ‘exclusive possession until the twenty-eighth of January 1851, when he sold said grant by good and sufficient deed to said Reynolds and Eaton; and proceeds to allege title through said Eaton by mesne conveyance to the whole thereof; and the answer further alleges that by the act of confirmation and the survey the said Eaton acquired title to the whole of said grant, and denies that the act of confirmation and the patent issued in pursuance thereof had the force and effect to convey any right, or title to the persons named in the

bill of complaint under and through whom said complainants claim to have an interest in said land; and allege that all persons put in possession of any portion of said lands except Fernandez abandoned and forfeited all their rights and claims to said lands and every part thereof, and set up the same defense of the statute of limitations and failure to bring suit as alleged in the pleas.

Replications were filed and upon the issues thus raised the proofs were taken.

The court below rendered final judgment against complainants and dismissed the bill with costs, and thereafter overruled motion for rehearing. Whereupon, appellants (complainants below) brought the case into this court, assigning error as to every material finding of fact and of law made by the court below.

In order to decide the many questions involved in this controversy, we must review the steps taken in the grant from its inception. We therefore advert to the fact that on August 9, 1827, the Mexican government, by its certain authorities, made the following order:

"Santa Fe, August 9, 1827: In session of yesterday the most excellent deputation of this Territory has disposed that the grant herein solicited be granted, holding the petitioners to what they offer, which is, that no other use will be made of the land but for cultivation, on condition that if, at any time, they make any other use of it, it shall be considered as abandoned, and the grantees without any right to its possession and that these have the same right as the rest of the public to pasture their animals in the vicinity thereof . . . "

This order is signed by Armijo, who was president of the territorial deputation (and at the same time governor of the territory) and by Ramon Abreau, its Secretary. While appellants base their title upon this order, the appellees contend that the grant, if supporting appellants' title at all, was the foundation of their claim to only those portions of the grant as were specifically

allotted to appellants' grantors, the original grantees,. and not as supporting any title to an interest in the undivided lands in the grant. The meaning of the grant can be best interpreted in the light of the proceedings which begot it. The initial step was the petition of Domingo Fernandez, dated April 26, 1822, in which he applied to the then governor of the Territory of New Mexico for the grant of lands for himself, his son and other persons, according to the boundaries mentioned in his petition; stating that what he asked was limited and was without injury, as land remained in the four directions for most extensive commons.    (We refer to the original Spanish, which seems to be fuller in certain places than the English translation.)    The land was not then granted by the governor, but he referred the petition to the town council to report, on April 27, 1822.    On June 13, 1822, the town council requested Domingo Fernandez to make a full report, which he did on June 25, 1822.    On June 27, 1822, the town council appointed a committee to examine the land and report in regard to the statements set out by Fernandez in his report. On July 8, 1822, the committee reported, as Fernandez had represented and stated that they found no obstacle to granting the lands solicited by Fernandez and the others with him to the amount that each one could cultivate without injury to the pastures or watering-places. Nothing further was done until June 16, 1827, when Domingo Fernandez petitioned the Territorial deputation,. or the governor (it is doubtful which), referring to his former petition, and made further statements of fact,. and thereby asked that the land be granted to him and thirty others who accompanied him, and stated that the boundaries were the same as he had given in his former petition.    On June 25, 1827, this last petition was referred, by the Territorial deputation, to the ayuntamiento, of Santa Fe, for report.    On July 26 following, the ayuntamiento, by the alcalde, who was the president thereof, made a report recommending the grant and that

the waters and pastures be common. Shortly after the making of the order or grant, by Armijo, and in pursuance thereto, on August 21, 1827, Jose Maria Martinez, first constitutional alcalde at Santa Fe, also president of the ayuntamiento at Santa Fe, at the request of Domingo Fernandez to place him and those who accompanied him in possession, gave juridical possession of the land included in the grant, in which he recited that its excellency had granted the land known as the old pueblo of San Cristobal, to Domingo Fernandez and thirty men who accompanied him to the said place, and that they should enjoy the same for themselves, their heirs and successors, with the understanding that if they should want to sell they should do so to the persons possessing, and for the current price of land, and that if anyone should wish to cause damage by selling to any other person than the grantees in consideration of his being a person of influence, from which might result damage to the poor people possessing it, etc. To this they agreed and said that they would always guard that circumstance, and that he who should fail in that regard should be declared without any right. The alcalde then at the request of Fernandez to place in possession himself and his companions, took him by the hand and conducted said Fernandez (the original grant document is here torn, the words missing probably being "y sus"), and his companions or those who accompanied him, over said tract. He pulled up grass, scattered handfuls of earth, broke off branches from trees, and they from great joy and satisfaction, uttered expressions saying, "Long live our actual president, Don Guadalupe Victoria, long live the Mexican nation," and they used other ceremonies and acts of possession in evidence of that they said they took possession of the tract of land, quietly, pacifically and without any opposition, for themselves, their heirs and successors. To this the alcalde certifies, and says: "I then, showed them the boundaries, on the east the Ojo de la Vaca, on the west

the front of the middle Creston, on the south, the Bajada de los Comanches, and on the north, the brow of the Creston, which are the boundaries enclosing the tract, the said Domingo Fernandez receiving the Canon de la Cueva, to the Spring of la Vaca, partitioning for cultivation the rest of the plan and place of the Canada de la Casita, the pasturage remaining free in the other directions up to said boundaries." The alcalde then divided out the cultivable lands, giving to Domingo Fernandez from the Mesita de la Lagunita upwards to the Ojo de la Vaca under the boundaries of the grant, and in continuation he measured from the said Mesita west and designated one hundred varas to each of twenty-five persons, in addition to Fernández, making in all twenty-six persons, all of whom he says received quite and peaceable possession. It will be seen that there are two documents of possession, one which gives the possession of the entire grant and specifies a certain portion set apart to Domingo Fernandez and other certain portions set apart to all the other parties. The second act of possession is the one giving out the specific pieces of land to all the persons, including Fernandez, for cultivation. These tracts designated in both the first and second documents of possession, which seem to have been consummated on the same day, gave out the cultivable lands which Fernandez received for himself and those received by the other parties for themselves, it being specified, that the pastures remained free, free to all the grantees without being divided or separated between them specifically. In the second specification of possession, made by Alcalde Martinez he says that all the parties agreed to build a house and work on the church, acequias and tanks. But he does not express any damage which would result, or any penalty which would be imposed in case of noncompliance, nor did he express that they should do so within any given time, nor that they were required to do so. It is not a condition. The only condition placed upon this grant by the granting authority was that of

cultivation. The alcalde pretended to make a condition in his acts of possession that if they sold to anyone else than the other parties at the current price, it should not be lawful and they should lose their rights; but viewing the grant as unaffected by any act of confirmation by Congress, it is clear that the alcalde had no right to impose any condition which was not imposed by the authorities making the grant in the grant itself. If he did have such right, there is furthermore no pretense that these parties ever sold while the country was under the Mexican government, so that the condition never could operate as a forfeiture.    Freemont v. U. S., 17 How. 561. While he and the deputation specified, the one that no other use should be made of the land than cultivation, and the other that it should not be sold— and in case it was used for other purposes or sold, contrary thereto, that it should be declared forfeited or abandoned—yet there is no such a condition attached to the failure to work on the church, or to build a house or work on the acequias or tanks, and it is a rule of law that where a condition is attached for failure to do one thing, and no condition is attached for failure to do another, the failure to do the thing to which no condition is attached is not to be considered as embraced in the penalty attached to the other, but the expression of the one idea excludes the other.

From the foregoing, we can see no justification for the contention of the appellees that the grant as originally made was made solely to Domingo Fernandez. The order of the governor of August 9, 1827, shows that the grant was made to all the petitioners; the petition therefore shows that it was asked for Fernandez and thirty others who accompanied him and the act of juridical possession shows that the alcalde took Fernandez and twenty-five others of the original petitioners over the grant, all of whom accepted the possession for themselves, their children and successors and expressed joy

and satisfaction at the same. But that the grant made by the Mexican government was in itself, unaided by the sanction of Congress, a valid grant of all the land within the boundary specified in the act of juridical possession, we need not and do not assert. The courts of justice are concluded by the action of the political department, and the political department of the government having acted upon this grant, that action must be regarded as a complete adjudication of the law as affecting this grant. The final action of Congress herein, is to be found in the act confirming the grant, which is as follows:

"That the private land claims in the Territory of New Mexico, as recommended for confirmation, by the surveyor-general of that Territory, and in his letter to the commissioner of the general land office, of the twelfth of January, eighteen hundred and fifty-eight, designated as numbers one, three, four, six, eight, nine, ten, twelve, fourteen, fifteen, sixteen, seventeen and eighteen, and the claim of E. W. Eaton, not entered on the corrected list of numbers, but standing on the original docket and abstract returns of the surveyor-general as number sixteen, be and they are hereby confirmed . . ."

It is contended by appellees that it was not the intention of Congress to confirm by this act, the claim of E. W. Eaton "as recommended by the surveyor-general," but as expressing its intention to absolutely confirm the grant to Eaton alone. We think however, that the grammatical sense of the phrase "as recommended for confirmation" applies to the claim of E. W. Eaton, which is here designated objectively and that this grant was confirmed in the same manner as those grants designated by numbers in the act were confirmed.

Having determined that the grant was confirmed as recommended we are guided by the decision of the Supreme Court of the United States in the case of Tameling v. Freehold Co., 93 U. S. 644, involving a grant con-

firmed by the same act of Congress, as to the effect to be given to the recommendation of the surveyor-general. That court there say:

"The surveyor-general in the exercise of the authority in which he is vested, decides then in the first instance. The final action on each claim reserved to Congress is, of course conclusive. It is obviously not the duty of this court to sit in judgment upon either the recital of matters of fact by the surveyor-general, or his decision declaring the validity of the grant. They are embodied in his report which was laid before Congress for its consideration and action. Congress acted upon the claim as recommended for confirmation by the surveyor-general."

Therefore whether this confirmation was a grant *de novo* as appellees contend, or was a recognition of a pre-existing right and title and related back to the inception of that right or title, as appellants contend, depends entirely upon the declaration of Congress in the premises. If Congress has expressed its intention within the law itself with certainty, it is not admissible to depart from that intention on any extraneous consideration or theory of construction. Sutherland on Stat. Cons., sec. 236. Without resorting to implication or presumption, therefore, we must give full force and effect to all that Congress has expressly declared. We think it indisputable that Congress in approving the recommendations of the surveyor-general has thereby adjudicated that all which he recommended is law so far as this case is concerned. The language of the section of the act of July 22, 1854, 10 Stat. 308, under which the report of the surveyor-general in this case was made in regard to these claims is as follows:

"That it shall be the duty of the surveyor-general, under such instruction as may be given by the secretary of the Interior to ascertain, the origin, nature, character and extent of all claims to lands under the laws and

usages and customs of Spain and Mexico . . . he shall make a full report on all such clams as originated before the cession of the Territory to the United States by the treaty of Guadalupe Hidalgo, denoting· the various grades of title, with his decision as to the validity or invalidity of each of the same under the laws, usages and customs of the country· before its cession to the United States."

The surveyor-general found that all the documents acted upon were original and duly authenticated; that the grant was legally made and the parties placed in possession and that it was therefore deemed a good and valid grant and confirmed to E. W. Eaton, as the assignee and· legal representative of Domingo Fernandez, and to the remaining original grantees who had not forfeited their right to the land by a non-compliance with the conditions of the grant. From one of the papers so duly authenticated we find that "legal, personal and loyal possession," was given of the entire grant, and that Fernandez and his companions took possession of it quietly and peacefully, for themselves, their children and successors. The operative words of this grant are those of a present grant in fee simple, with a condition subsequent annexed, and in the absence of any expression to the contrary by Congress, they must be held to have been sufficient to accomplish the purpose the parties had in view; and which Congress has declared was accomplished. We conclude therefore that the grade of the title denoted by the surveyor-general was of the highest kind, that no further steps were required to complete the grant and that the grantee put in possession acquired vested rights thereunder. All of which Congress has made *res judicata* by the confirmatory act. Kennedy v. Hunt's Lessee, 7 How. 586-592; Palmer v. Low, 98 U. S. 1-19; Tameling v. Freehold Co., supra; U. S. v. Joseph, 94 U. S. 114.

In support of their position, the appellees cite Tameling v. Freehold Co., supra. In this case, the Supreme Court of the United States was dealing with a

Spanish land grant in New Mexico, recommended for confirmation and confirmed by the same act of Congress which confirmed the grant here involved, and they quote therefrom the following: "I hold therefore that the act of Congress operated as a grant *de novo* for all the land within the boundaries, as given in the report of the surveyor-general," and appellees argue on the theory that under the laws of Mexico the grant was legally a grant to the associates of Domingo Fernandez of the one hundred vara strips allotted to them for cultivation, and therefore, if the claim had been presented to the court of private land claims, that court would have been obliged to reject the unallotted portion of the grant, and that the political department of the government alone could have confirmed that portion to anybody, and therefore insist that Congress in confirming the grant, made a grant *de novo*.

In the Tameling case, supra, we think the court decided in effect that although it might be true that a correct interpretation of the laws of Mexico as applied to a Mexican land grant, would entitle the claimants thereunder to only a fractional part of the tract confirmed by Congress as such a grant, still Congress having confirmed the grant so enlarged, did by its confirmatory act, pass the title of the United States to such portion of the tract as had not been theretofore granted by Mexico to its grantees, as effectually as if it contained in terms a grant *de novo*. The court did not decide that the United States held the legal title to that portion of the grant in excess of the number of leagues which might have been lawfully granted under the Mexican government; nor did it decide that the interpretation of the Mexican laws by Congress could be revised in any manner. Indeed it decided the contrary. It anchored its judgment upon the sole proposition that the action of Congress in confirming the grant as recommended by the surveyor-general without limitation as to quantity, was an unassailable finality. The grantees here being deter-

mined to have vested rights in the entire grant, we con-
clude that appellees' theory, as herein stated, is inap-
plicable to this case. They contend further however,
that in any event, the act of confirmation itself amounts
to a new grant and fixes the rights of the parties in
the case, relying again upon the quotation from the
Tameling case, supra. The meaning of this quotation
may be best understood by looking further into the case
in which it is used, and by considering similar language
as applied in other cases by the Supreme Court. That
court in the Tameling case further says:

"We have repeatedly held that individual rights of
property, in the Territory acquired by the United States
from Mexico, were not affected by the change of sov-
ereignty and jurisdiction. They were entitled to protec-
tion, whether the party had the full and absolute owner-
ship of the land, or merely an equitable interest therein,
which required some further act of the government to
vest in him a perfect title. No jurisdiction over such
claims in New Mexico was conferred upon the courts."

The decision then recites the authority of the sur-
veyor-general and the binding character of his findings
of fact, and then proceeds:

"We need only say that he distinctly sets forth, that
they were put in possession, vesting in them, their chil-
dren and successors a title in fee to said land, and that
he reached the conclusion that the grant is a good and
valid one, and that a legal title vests in Beaubien to the
land embraced within the limits contained in the peti-
tion . . . Congress acted upon the claim as recom-
mended for confirmation by the surveyor-general. The
confirmation being absolute and unconditional, we must
regard it as effectual and operative for the entire tract.
The phraseology of the confirmatory act is, in our opin-
ion, explicit and unequivocal. In Ryan v. Carter et al.,
we recognized and enforced as the settled doctrine of
this court, that such an act passes the title of the United
States as effectually as if it contained in terms a grant

*de novo,* and that a grant may be made by law as well
as a patent pursuant to law."

Does this language mean all that it is claimed to
mean by the appellee and more than on its fact it pur-
ports to declare?  A brief examination of the authorities
will show that we are not justified in expanding its
meaning beyond the literal import.  The case of Ryan
v. Carter, from which this language is adopted into the
Tameling case, was a case in which the Supreme Court
considered the effect of the act of June 13, 1812, which
act it held "confirmed, *proprio vigore,* the rights, title
and claims to the lands embraced by it, and operated as
a grant to all intents and purposes. Repeated decisions
of this court have declared that such a statute passes the
title of the United States as effectually as if it contained
in terms a grant *de novo."*

Numerous cases decided by the Supreme Court of
the United States involving the construction of this act
of June 13, 1812, reveal the fact that in every case the
confirmatory act has been construed either "to operate
as a grant of" or to be a grant of the fee from the
United States to the claimant. In Glasgow v. Baker, 125
U. S. 560, the court held it to be a grant *in praesenti,* of all
the title of the United States.   The expressions, "operate
as a grant," "be as effectual as a grant," and the like, are
in no case used by the Supreme Court in any different
sense than that in which they are used in the cases cited.
It is simply a judicial construction to the effect that
Congress intends by an act of confirmation, when there
is a confirmee or class of confirmees to take thereunder,
that the same shall operate to vest in the confirmee any
legal title which may be in the United States.  A clear
statement of the doctrine laid down by the United States
Supreme Court in the construction of these acts of con-
firmation, is to be found in the case of Langdeau v.
Haynes, 88 U. S. 521.  We quote therefrom as follows:

"In  the legislation of Congress, a patent has a
double operation.  It is a conveyance by the government

when the government has any interest to convey; but where it is issued upon the confirmation of a claim of a pre-existing title it is documentary evidence, having the dignity of a record, of the existence of that title, or of such equities representing the claim as justify its recognition and confirmation. The instrument is not the less efficacious as evidence of previously existing right because it also embodies words of release or transfer from the government. The whole error of the plaintiff arises from his theory that the fee to the land in controversy passed to the United States by the cession from Virginia, and that a patent was essential for its transfer to the claimant; whereas, with respect to the possession of the inhabitants and settlers mentioned in the deed of cession, the fee never passed to the United States; and if it had passed and a mere equitable title had remained in the complainants the confirmation by the act of 1807 would have operated as a release to them of the interest of the United States. . . . A legislative confirmation of a claim to land is a recognition of the validity of such claim and operates as effectually as a grant or quitclaim from the government. . . . It was for the confirmation of existing possessions and titles that the deed of cession stipulated, not the transfer of any new title. Virginia recognized the general rule of public law that by the cession of Territory from one State to another public property and sovereignty alone pass. Even in cases of conquest, Mr. Chief Justice Marshall observes, in U. S. v. Percheman, 7 Pet. 51, 87: 'It is unusual for the conqueror to do more than displace the sovereign and assume dominion over the country, and the sense of justice and right which is felt by the whole civilized world would be outraged if private property should be generally confiscated and private rights annulled.' Had Florida changed its sovereign by an act containing no stipulation respecting the property or individuals the right of property in all those who became subjects or citizens of the new government would have been un-

affected by the change. It would have remained the same as under the ancient sovereign.  . . . . This confirmation was the fulfillment of the condition stipulated in the deed of cession so far as the complainants are concerned. It was an authoritative recognition by record of the ancient possession and title of their ancestor, and gave to them such assurance of the validity of that possession and title as would be always respected by the courts of the country."

There can be no misunderstanding of the reasoning of Justice Field in Langdeau v. Haynes, supra; nor the effect to be given the phrase "operate as effectually as a grant or quitclaim from the government," as used by him. Similar language in Ryan v. Carter, supra, is used in precisely the same sense. Nor in the Tameling case, have we seen that it had any other signification. The same construction is put upon similar language used by the Supreme Court in the case of U. S. v. Maxwell Land Grant Company, 121 U. S. 366. Any other construction would be antagonistic to many decisions of the Supreme Court of the United States as well as contrary to reason, and we find no case in which that court has departed from this long settled doctrine. As a judicial interpretation of the intention of Congress to recognize and confirm appellants' ancient title, they have cited the case of U. S. v. Joseph, 94 U. S. 114, involving the confirmation of the claim of the Pueblo of Taos, by a similar act of Congress. The Supreme Court there say:

"The Pueblo Indians, on the contrary, hold their lands by a right superior to that of the United States. Their title dates back to grants made by the government ·of Spain, before the Mexican revolution, a title which was fully recognized by the Mexican government and protected by it in the treaty, by which this country and the allegiance of its inhabitants were transferred to the United States.  . . . It is unnecessary to waste words to prove that this was a recognition of the title previously held by those people, and a disclaimer by the

government of any right of present or future interference, except such as would be exercised in the case of any individual holding by competent and perfect title in his individual right."

In Palmer v. Low, 98 U. S. 1-19, the Supreme Court say, referring to an act of Congress in confirming an alcalde grant, "Clearly therefore the act of Congress could not have been intended for the grant of a new right, but simply for the confirmation of the old one."

And in Colorado Company v. Commissioners, referring to a grant held by the Supreme Court to have been an imperfect one, the Supreme Court of Colorado said: "Whatever may be said of the title given by the Mexican government, we think the effect of this act of confirmation is to establish the title from the date of the grant by the Mexican government."

The Supreme Court of the United States in affirming the above doctrine say: "We agree with what he has said (referring to Supreme Court of Colorado) that the title when perfected, relates back to and is founded on the grant by Mexico."

Colorado Company v. Commissioners, 95 U. S. 266; Tripp v. Spring, 5 Sawy. 215; Wright v. Roseberry, 121 U. S. 488; Slidell v. Grandjeau, 111 U. S. 439; Langdeau v. Haynes, 21 Wall. 521; Knight v. United Land Assn., 142 U. S. 161. And this doctrine is again clearly announced by the Supreme Court in the recent case of United States v. Valdez. decided October 30, 1899 (U. S. Sup. Ct. Rep.).

We conclude from an examination of these authorities that the Supreme Court of the United States considers these acts of confirmation as operating in two ways: First, as a legislative recognition of the existence and validity of the original grants, and, second, as a quitclaim and transfer of any possible interest which our government might have in and to the lands alleged to be within the grants. It is also very clear that the United States Supreme Court have so regarded

the effect of an act of confirmation and patent thereunder by Congress in its numerous decisions in those cases in which both parties claimed the premises in controversy under conflicting confirmations. Willot v. Sanford, 19 How. 79; Lesois v. Bramlel, 4 How. 464; Henshaw v. Bissell, 18 Wall. 255; Miller v. Dale, 92 U. S. 474; Trenier v. Stewart, 101 U. S. 797.

We must decide, therefore, that when the fee is not vested in the United States, the confirmatory act is the fulfillment of the treaty obligation of the government and an authoritative recognition by record of the ancient possessions and title of the confirmees and gives to them such assurance of the validity of that possession and title as would always be respected by the courts of the country.

The fee having passed directly from the Mexican government to the grantee and Congress having perceived the possibility of forfeiture under the Mexican government of one or of all of the interest except that of Eaton as the assignee and legal representative of Domingo Fernandez, out of an abundance of caution and in order that there might be no question as to the confirmation extending to others than those who had rights entitled to protection under the treaty, has merely performed its whole duty in the promises in inviolably respecting vested rights thereunder by confirming the grant to those who had not forfeited. The confirmation operated, therefore, as to those interests under the Mexican grant which had not been forfeited at the time of the treaty as an authoritative recognition of the record and validity of the ancient possession and title, while it seems to have operated as a grant *de novo* to the confirmee or confirmees of any interests which may have been forfeited under the Mexican government; that is, if by reason of any forfeiture under the Mexican government, the legal title to any part of the land became vested in the United States at the time of its acquisition of the country, the confirmation operated to

vest such title in Eaton, or in Eaton and those other original grantees whose rights had not been forfeited under the Mexican government. We think that Congress has decided that the interest of Eaton as assignee and legal representative of Fernandez, existed up to the time of confirmation; but that it has not undertaken to decide as to any other interests that they have or have not continued, having left the question of their continued existence just where it found them under the treaty and their ascertainment to the judicial department of the government. The position of appellees therefore that this is a grant *de novo* is tenable only so far as the confirmation may be operative as a conveyance or quitclaim to Eaton and the grantees who had not forfeited, of the legal title of the United States passed to it from the Mexican government and acquired by the latter government from those original grantees who might have forfeited thereunder. Having reached the conclusion that the effect of the act of Congress was to adjudicate that title had vested in the grantees under the Mexican government, subject to the possibility of forfeiture prior to the acquisition of the country by the United States it logically follows that any change in the condition of that title can not be presumed but must be proved. A status once shown to exist is held to continue until proof of a change is adduced. It is clear therefore that anyone asserting that such a change has taken place must present evidence of the fact.

We are thus brought to a consideration of the question as to whether this record contains any evidence of such a forfeiture as is claimed by the appellees. The Supreme Court of the United States has decided that no forfeiture can happen or be authorized for any act or fault after the treaty. U. S. v. Sutter, 21 How. 178. We are concerned therefore only with the question of forfeiture under the Mexican government, appellees contending that all interests except that of Domingo Fernandez had been so forfeited. The law is well settled

that forfeiture of such right and title may only be shown by denouncement or some official proceeding equivalent thereto. Appellees argue that the petition of Fernandez addressed to the political chief in 1829, and the direction of the governor thereon, constitute such a proceeding. Fernandez complained that his associates ("a list of which;" he says, "I do not accompany for your information on account of its being in the possession of the Justice") had not worked in cleaning out the Spring, in the construction of ponds and other works, and prayed that they be compelled to do so. Acting thereon, on the same day the governor gave the following direction: "A constitutional justice of this city upon being informed of the claim made by citizen Domingo Fernandez will cause the individuals of whom he complains to present themselves and in case they do not proceed to cultivate the land they will be immediately excluded from the list and industrious individuals will be substituted in their place who may require lands for cultivation." Here the record stops; it shows no further action on the part of the government, shows no entry, no dispossession, no reinvestiture of title in anyone else, and no claiming of it on the part of the government for itself or decree whatever. Mere breach of conditions subsequent does not *ipso facto* effect a reverter of title, until the proper steps are taken to consummate the forfeiture. Ruch v. Rock Island, 97 U. S. 693; Ferris v. Coover, 10 Cal. 589; Hihn v. Peck, 30 Cal. 289. From the evidence in this record it is indisputable that under the Mexican government no forfeiture was ever asserted against those original grantees who went into possession of this grant; and we conclude therefore that their title remained unimpaired at the time of the treaty. Freemont v. U. S., 17 How. 511; Hornsby v. U. S., 10 Wall. 240; Vanderslice v. Hanks, 3 Cal. 43; Merle v. Mathews, 26 Cal. 478. Such is the reasonable conclusion to be derived from the original grant papers which were put in evidence. But if it were possible to put any other construction on them

and it were held that the burden was on the appellant
to establish the fact that there had been no forfeiture of
the interests of those who were placed in possession, yet
there is ample proof of such fact in the record intro-
duced by appellant, in the transcript of proceedings had
before the surveyor-general at the instance of Eaton
from whom appellees deraign title and who were there-
fore privy in title to. him, to which proceedings before
the surveyor-general all persons then having an interest
in the property in question were parties. The evidence of
the witnesses then taken and which has been included in
said transcript and introduced in evidence here is com-
petent evidence in this cause, said witnesses being shown
to be dead at the time of the trial of this cause and their
evidence having been taken on an investigation duly
authorized and in reference to the subject-matter of this
suit. The court below, in the findings and conclusions
to the contrary to those here announced, was in error.

The appellees, however, rely upon the further de-
fense of the statute of limitations to defeat appellants'
action. The confirmation limiting Eaton's title to that
derived through Fernandez, this court can not view the
deed from which Eaton's title was derived and upon
which the claim is based in any different light than it
appears to have been considered by Congress. So long
therefore as Eaton and his successors in title deraign
their title under the grant, the statute of limitations
will not avail them as against any of the cograntees,
because at the time of the confirmation Eaton's relation
to them was that of a cotenant, and his possession was
as much on their behalf as his own. Therefore if ap-
pellees continued to claim under the confirmation, or
claimed under the deed from Domingo Fernandez to
Eaton until it was placed of record in 1886, four years
prior to the institution of this suit, they may not assail
or dispute the common title. In order that appellees
may sustain their claim of adverse possession under the
statute, it must appear from the record that such a

state of facts has been established as constituted either actual or constructive ouster of one cotenant by another, and a ripening thereafter of title in them under the statute. Tracing appellees' claim of adverse possession, we find they contend, first, that the deed from Fernandez to Eaton, dated January 20, 1851 (recorded in 1886) conveyed the entire grant; that Eaton thereunder went into possession thereof, and that Eaton and Laughlin, his successor in title, held the grant adversely to appellants for more than ten years prior to the bringing of this suit. This contention, so far as it is based upon the deed of 1851, is not borne out by the record. The general description in the deed from Fernandez to Eaton of "all that tract or parcel of land known as the lands of Pueblo of San Cristobal," is limited by the specific description therein, which is conceded to be that portion of the grant embraced within the first survey, or about a third part only of the whole. The court will not presume that Fernandez intended to convey more than he thought he owned, and Eaton himself testified that he claimed no more than the deed from Fernandez to him purported to convey. Eaton's deed of 1874 to Laughlin conveys: "That certain portion of the grant made to Domingo Fernandez by the Mexican authorities," and Eaton in delivering possession to Laughlin, delivered possession of only that portion of the grant so embraced within the so-called first survey, and Laughlin's lessee, Wiley, testified that he received possession as such lessee from Eaton (Eaton having held after deeding for nearly two years as Laughlin's agent), in 1876, of this surveyed part of the grant, and that as Laughlin's lessee he neither held nor claimed any other possession up to 1888. Even if this possession were sufficient to constitute an adverse possession against appellants, which we need not and do not here decide, it can not be held to have extended to any other portion of the grant than that within the first survey. But appellees further trace their al-

leged adverse possession of the grant and particularly to the remainder of the grant by claiming under Eaton's possession, followed by Gildersleeve's possession, under Eaton's deed to him in 1878, purporting to convey the entire grant, and Laughlin's possession under Gildersleeve's deed to him in 1890, which latter deed purported to convey that portion of the grant not theretofore conveyed to Laughlin by Eaton. There is no evidence whatever in the record to show that Eaton prior to 1874, when he deeded to Laughlin, ever had possession of any portion of the grant except that which fell within the first survey; nor indeed is there any evidence that he claimed to have any larger possession until he made the deed to Gildersleeve in 1878, purporting to convey thereby the entire grant as described in the act of juridical possession. Assuming for the purposes of a decision of this case, that this deed is a sufficient act on Eaton's part to constitute ouster of his cotenants, the question arises whether the possession thereunder up to April, 1890, and the possession of his successor, Laughlin, from then until suit instituted, has been of such a character as to extinguish the title of the cograntees and to vest in Laughlin an indefeasible title under the statute. The court below found as a matter of law that it did; in effect thereby adjudicating that by virtue of Gildersleeve's possession for more than ten years, a title had been acquired to a tract of land covering in extent over eighty-one thousand acres. Appellees however, having already set up a different claim of adverse possession under Laughlin, who entered by virtue of Eaton's deed to him, they would seem to be here claiming under Gildersleeve's adverse possession only that part of the grant not theretofore occupied by Laughlin. Our conclusion, as to these claims covers both aspects.

All of the testimony in this voluminous record offered by appellees in support of this claim of adverse possession by Gildersleeve we quote. Mr. Gildersleeve testified:

"The interest I acquired by purchase from Eaton was uninclosed and the exact extent of it at that time unknown, as a question of a resurvey of the grant was then pending before the Land Department of the United States; a resurvey was ordered and made in 1879, and completed in that year; from that time until the time I conveyed to Laughlin, the portion of the grant so conveyed by me to him has remained uninclosed; at different times between 1879 and 1880 from the time I sold to him, I have leased portions of the grant and had parties in possession for me  .  .  .  I leased a portion of it at one time to Jose de la Cruz Chavez, and at another time to Romulo Martinez; I employed Manuel Robledo in 1886 to take possession of it and to keep off herds of sheep and cattle and I had two or three other parties employed at different times between 1880 and 1888. I don't recall their names now.  .  .  I gave them (Jose de la Cruz Chavez and Romulo Martinez) permission at different times to herd cattle and sheep on the portion of the grant that I purchased, and also to lamb sheep at some of the wateringplaces on the grant. I didn't see them there but they came afterwards and settled for the rental.  .  .  .  He (Manuel Robledo) was instructed by me to keep herds of sheep and cattle off the grant and reported to me from time to time that he was doing so. I paid him.  .  .  .  At the time I purchased from Mr. Eaton (1878) until I sold to Mr. Laughlin (1890) I was on the land perhaps an average of once a year; sometimes I would stay a day or two; there may have been several years that I was not there at all. I can not now recall the dates of my being there, nor the length of time I remained at my different visits.  .  .  .  My recollection is that he (Manuel Robledo) was employed by me in 1886, in the summer and fall, about six months."

Appellees failed to call as witnesses in corroboration of Gildersleeve, any of the parties referred to by him as his agents in possession, but appellants called

Manuel Robledo who corroborated appellee, Gildersleeve, in part, as follows:

"Q. Do you know the property known as the San Cristobal or Eaton Grant? A. I know the grant of San Cristobal which Mr. Wilder (Wiley) was taking care of, and where Mr. Eaton lived before. Q. State whether or not at any time, you acted as agent for anyone with reference to that property or any portion thereof? A. Yes, I acted as agent as an employee of Mr. Charles H. Gildersleeve, watching the property so that no trespassers would enter. I put those notices on the grant so as to keep trespassers away; my best recollection and belief is that they were signed with three names, Gildersleeve, Catron and Laughlin were signed to them. Mr. Gildersleeve paid for the services."

It is also shown by Gildersleeve's testimony that in 1879 when he visited the grant, he made his headquarters at the residence of Nicolas Pino, one of the appellants, whose Stinking Spring ranch, house and some other improvements are admitted to be within the limits of the grant, and admitted to have been Pino's residence since late in the sixties. Gildersleeve further testified that Pino asserted to him that he claimed he had purchased for account of himself and Mr Catron, appellant, some of the interests of the parties named in the act of possession of August 21, 1827, and that Pino exhibited to him, Gildersleeve, some deeds purporting to convey to him, Pino, the interests of some of the parties named in the act of possession of 1827; he further testified that appellant, Catron, had told him in 1879, or about that time, that he, Catron and Pino, claimed interests in the grant; he also testified that he proposed, that if Nicolas Pino and Ambrosio Pino would cause the lands they claimed to own within the grant to be surveyed, he, Gildersleeve, would pay the expense of the survey and give them a deed for it; that only one piece of land had ever been surveyed; that he refused to give Ambrosio Pino a deed for the property until he, and Nicolas Pino should

cause a survey to be made of all the other lands they were claiming within the grant. "Q. Did they ever do this? A. No." By appellees' witnesses Sylvester Davis, Jose Manuel Sandoval and Robert Stanfield, they have themselves established the fact that Pino, appellant, continued uninterruptedly to occupy his Stinking Springs ranch, house and other improvements, which were conceded to be upon the grant and which were identified by Gildersleeve in his testimony, from the year 1869 or 1870 up to the date of the giving of their testimony in this cause in 1895, and that appellant Pino pastured and grazed his live stock during all of said time over the whole of said grant and tract of land which was not cultivated or enclosed.

Citation of authorities is not necessary to show that possession to operate as a bar under the statute must be open, visible, notorious, continuous and adverse. We cannot find that the character of Gildersleeve's possession meets any requirements of the law. He is not shown to have exercised for any period of time dominion over the whole grant, nor to have occupied any particular locality on the grant for a single day during the entire period of his claim of possession nor to have placed any improvements upon the property. His evidence taken most strongly in his favor shows only what has been characterized by the authorities as a roving possession, and such a possession is ineffectual to create a bar. There being no evidence in the record to uphold the findings of the court below, upon which it based its conclusion of law that the defense of the statute of limitations was satisfactorily sustained, the judgment must for this further error be reversed.

It appears from Gildersleeve's evidence and from the deeds in evidence that the property in question was purchased at a tax sale on June 16, 1885, by one George C. Preston, who in so doing acted as the agent of Gildersleeve, the purchase, however, being made in his own

name. Gildersleeve, as he testifies, paid the amount of
the purchase money, and Preston assigned the certificate
of sale given to him to Gildersleeve prior to the expira-
tion of three years after the day of sale, which is the time
given by the statute for redemption. It also appears
from the record that Gildersleeve, at the time of said
sale for taxes, and at the time said Preston assigned the
certificate of sale to him, was the owner by purchase
and conveyance to him of the original interests of one or
more of the said twenty-six original grantees of the en-
tire grant, and that said conveyances to him of the
said interests in the entire grant were of record in the
records of deeds and conveyances in Santa Fe county,.
where the land in question was situate, and that the
said Gildersleeve was at the time of the said sale for
taxes, and at the time of the said assignment by Preston
of the certificate of said sale, to him, Gildersleeve, an
owner of an undivided interest in the whole of said tract
of land, excepting the small allotments made in sever-
alty to the said twenty-six grantees. By the property
returned for taxes on which said sale was made, and
which is in evidence, it appears that the property was
not returned for taxation by anyone, nor in the name
of anyone, nor against "unknown owners," as it should
have been under and in accordance with section 4041 of
the Compiled Laws; but it appears thereby that it was.
simply an assessment of "the undivided two-thirds (2-3)
of the Eaton grant," which was not a legal assessment
in any manner; besides, it appears from the evidence
that appellant, Pino, then an owner of an interest in
said property, and now deceased, had for the same time-
in his own name, made a return for taxation of his in-
terest in the said entire tract of land which had been
accepted and the taxes thereon paid by him. Gilder-
sleeve, it appears, after the expiration of three years:
from the date of the purchase by Preston for him, under
the assignment from Preston, applied for and on Decem-
ber 3, 1888, obtained a deed of conveyance to him of the:

said land, as sold for non-payment of taxes. Not only was the assessment under which Gildersleeve purchased void, but his deed was also void; and even if it were not, the payment of taxes by Gildersleeve in that way on a sale and assignment to him of the certificate of sale, while he was the owner of an undivided interest in the property so attempted to be conveyed to him, operated as a redemption of the property from the tax sale and as a satisfaction of the taxes and a discharge of the land from the operation of the sale on behalf of all the other owners as well as himself. Certainly the payment by appellant Pino, of the taxes on his interest, would have at least as much force and effect as the purchase and conveyance to Gildersleeve under the assessment through which he purchased. It also appears by the evidence of plaintiff Catron, that Catron also actually paid to the collector of the county the taxes for which that sale to Preston was made. It is not necessary, however, to decide which evidence, that of Catron or of Gildersleeve, should be given most credit, for the reason that it is well established by numerous authorities, that the payment of taxes by an owner of an undivided interest before the right of redemption has expired, either for the purpose of redeeming or for the purpose of having the certificate of sale assigned to him, so as to get the title in his own name, is simply a redemption or payment of the taxes for and on behalf of all of his associates in title. And as it clearly appears of record in this case that Gildersleeve was at the time of the said sale for taxes and at the time of the assignment of said certificate of sale to him, and also at the time he paid the amount of the purchase price, which was less than three years from the date of the sale, an owner of an undivided interest in said property, such payment is held by all the authorities to be simply a payment of the taxes and a redemption from the sale for taxes for the benefit of himself and all of his co-owners in the title, and the conveyance subsequently made to him thereof was of no

force, effect or validity. Blackwell on Tax Title, 571-2; Lewis v Robinson, 10 Watts 354; Williams v. Gray, 3 M'e. 207-8; Brown v. Hogle, 30 Ill. 119; Dubois v. Campu, 34 Mich. 360; Paige v. Webster, 8 Mich. 263; Butler v. Porter, 13 Mich. 292; and other cases cited in Blackwell on Tax Title.

As a consequence of the foregoing the conveyance by Gildersleeve to defendant Laughlin, which purports to convey the entire property in question is only colorable so far as it undertakes to convey any interest except such as Gildersleeve at the time possessed, independent of the said conveyance from the said tax sale, said deed not including any of the interests shown to be the property of other grantees, their heirs or assigns, who had sold to appellants Pino or Catron, or who had not sold and conveyed at all.

The deeds of conveyance under said tax sale to Gildersleeve and of said Gildersleeve to Laughlin having been put of record, are clouds upon the title of appellant, and they and their records should be cancelled, and the appellant Catron's title should be relieved from said cloud placed upon it, he being now the owner of the interest of Pino, which the record shows was conveyed to him after the commencement of this suit; and said appellant Catron's title should be quieted and set at rest and the said appellee Laughlin decreed to be barred and forever estopped from having or claiming any right or title to the said premises except so far as he may be able to show himself entitled to those interests in the grant and the allotments of cultivable land thereto pertaining other than the nineteen twenty-sixths (19-26ths) parts and one twelfth of one twenty-sixth (1-12 of 1-26) part of the said grant and the allotments of cultivable land pertaining thereto claimed and alleged to be owned by appellant Catron, and further except so far as he may be able to assert title by adverse possession to any part or all of said portion of the grant lying within the so-called first survey thereof.

The judgment of the court below is reversed and the cause remanded with directions to the court below to proceed therein in accordance with the law as expressed in this opinion.

The above opinion was written by Crumpacker, A. J., while he was on the bench, and the same is adopted by this court as its opinion.

.William J. Mills, Chief Justice.